In the Matter of Allan SCHUSTERMAN, Joan Schusterman, Debtors.

**DIVISION OF SPECIAL REVENUE, STATE OF CONNECTICUT, Plaintiff,**

v.

**Allan SCHUSTERMAN, Joan Schusterman, Defendants.**

Bankruptcy No. 2–89–00604.
Adv. No. 2–89–0192.

United States Bankruptcy Court, D. Connecticut.

Dec. 8, 1989.

Richard M. Sheridan, Asst. Atty. Gen., Hartford, Conn., for plaintiff.

John P. Zanini, Beck and Eldergill, Manchester, Conn., for debtors-defendants.

MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

I.

The State of Connecticut, Department of Special Revenue (State) commenced an adversary proceeding against Allan Schusterman and Joan Schusterman (debtors) seeking a determination that a debt due the State is nondischargeable because the debt arose out of a defalcation while the debtors were "acting in a fiduciary capacity." *See* 11 U.S.C. § 523(a)(4) (1988).[1] The parties

---

1. *Section 523. Exceptions to discharge.*

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

have submitted the matter upon a stipulation of facts and memoranda of law.

## II.

The debtors were proprietors of a convenience store known as Offshay's Grocery, located at North Main Street, Marlborough, Connecticut. On or about March 18, 1980, in accordance with the Connecticut General Statutes, the State licensed the debtors as lottery sales agents and they thereby became engaged in the sale of Connecticut lottery tickets. In the course of the operation of their store, the debtors commingled funds generated by the sale of lottery tickets with other general revenue from the store. For the weeks ending November and December 1988, the debtors were indebted to the State in the principal amount of $6,358.63 and failed to remit this amount to the State. The amount now due the State equals $7,384.54 which represents, in addition to the principal, a delinquency assessment and statutory interest.

On May 12, 1989, the debtors filed a voluntary chapter 7 petition scheduling debts of $1,071,300.00 and assets totalling $216,350.00. The court, on September 21, 1989, granted the debtors a discharge from their dischargeable debts. On August 18, 1989, the State timely filed its complaint to determine the dischargeability of its debt.

## III.

The State contends that under Conn.Gen. Stat. § 12–569 and regulations issued pursuant thereto, the method of selecting agents or vendors for the sale of lottery tickets to the public makes these agents fiduciaries for the State under an express trust. In 1980, the State brought a complaint against a bankrupt in this court making the same claim under § 17(a)(4) of the Bankruptcy Act of 1898.[2] The court rejected the State's position. *See State of Connecticut v. Great Oak Farms, Inc. (In re Great Oak Farms, Inc.)*, No. H–79–542, slip op. (Bankr.D.Conn. April 29, 1980), at-

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

tached to this memorandum of decision (at p. 895). While the involved statutes have remained unchanged since *Great Oak* was decided, the Department of Special Revenue in 1984 amended its regulations to add language purporting to create a fiduciary relationship between the State and its lottery sales agents. Section 12–569–6 of the regulations now reads:

> *Sec. 12–569–6(1). Obligations of licensed agents*
>
> The issuance of a license by the division to any person as a lottery sales agent shall constitute acceptance by the agent of the following conditions:
>
> (1) *Fiduciary relationship.* An agent shall assume, in the sale of lottery tickets and the receipt of revenue therefrom, a fiduciary relationship with the division and state of Connecticut.
>
> All moneys received by lottery sales agents from the sale of lottery tickets shall constitute a trust fund until paid into the depository designated by the division. The sales agent ... shall be personally liable for all such lottery ticket proceeds which shall be kept separate and apart from all other funds and assets and shall not be commingled with any other funds or assets of the lottery sales agent.

Conn. Agencies Regs. § 12–569–6(1) (1985). The State asserts that these new provisions "radically alter the relationship between the agent and the State" in that they "impose fiduciary responsibilities, create a trust fund, and forbid commingling," and that these provisions, if in existence at the time of the events described in *Great Oak*, would have resulted in a favorable ruling for the State. *State Memo* at 897. In addition, the State heavily relies on a decision by the Rhode Island bankruptcy court holding that the unexplained failure by a lottery ticket agent to remit proceeds received from lottery ticket sales creates a nondischargeable debt under § 523(a)(4). *See Rhode Island Lottery Commission v. Cairone (In re Cairone)*, 12 B.R. 60 (Bankr.D.R.I.1981).

11 U.S.C. § 523(a)(4) (1988).

**2.** Code § 523(a)(4) repeats § 17(a)(4) almost verbatim.

After due consideration, I conclude that *Great Oak* was properly decided and that despite the State's closely-reasoned arguments in its memorandum, the 1984 changes made in the State's regulations do not alter the result. With respect, I differ with the conclusion reached in *In re Cairone.*

The scenario here of a creditor changing the words of a contractual transaction without changing the substance of the arrangement mirrors the situation that Mr. Justice Cardozo perceptively described in the leading case of *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). *Davis* determined, that to protect an individual's bankruptcy discharge, the purposeless use of words of trust does not turn an ordinary commercial transaction into one creating a trust.

> [A] factor does not act in fiduciary capacity.... [His] obligation is not turned into one arising from a trust because the parties to one of the documents has chosen to speak of it as a trust.... The relation would be no different if the duty had been stated in terms of covenant alone without descriptive epithet.

*Id.* at 333–334, 55 S.Ct. at 153–154 (citations omitted).

At bottom, the State is operating a gambling business designed, at least in part, to raise revenue. The State uses agents to sell the inventory (lottery tickets) of this business, and the relationship between the State and its agents cannot by the use of "descriptive epithets" transform, for the sole purpose of negating the discharge provisions of federal bankruptcy laws, an otherwise dischargeable debt into a nondischargeable debt. *See American Ins. Co. v. Lucas (In re Lucas)*, 21 B.R. 585 (Bankr. W.D.Pa.1982) (failure of debtors to pay Commonwealth of Pennsylvania hunting and fishing license fees collected by debtors as agents does not create nondischargeable debt); *Missouri Dep't of Conservation v. Schnitz (In re Schnitz)*, 52 B.R. 951 (W.D.Mo.1985) (agreement between debtors and Missouri Conservation Commission that monies collected by debtors as agents of state to sell hunting and fishing permits were to be held in trust, and debtors placed funds collected in general business account, did not create nondischargeable debt because effect of bankruptcy discharge cannot be circumvented by adding trust language to ordinary commercial arrangement); *cf. Barclays American/Business Credit, Inc. v. Long (In re Long)*, 44 B.R. 300, 304–305 (Bankr.D.Minn.1983) (where creditor placed language in security agreement that all remittances received by debtor to be held as creditor's property by debtor as trustee of an express trust, failure by debtor to pay creditor did not create nondischargeable debt because no separate trust agreement existed and no true fiduciary responsibilities placed on debtor. Verbal legerdemain does not impose fiduciary duty on debtor.); *Congress Fin. Corp. v. Levitan (In re Levitan)*, 46 B.R. 380, 386 (Bankr.E.D.N.Y.1985) (If creditor can fashion agreements inserting trust language and imposing duties upon the debtor for the protection of collateral in order to create nondischargeable debt, the general rule favoring discharge would be "swallow[ed]".).

### IV.

The court holds that Conn.Gen.Stat. § 12–569 and the regulations promulgated thereunder fail to make lottery sales agents' actions fiduciary ones within the context and purpose of Code § 523(a)(4). The debt of the debtors to the State is determined to be discharged.

### APPENDIX

United States Bankruptcy Court
District of Connecticut

In Bankruptcy No. H–79–542

In The Matter Of: Great Oak Farms, Inc., Bankrupt

Division of Special Revenue, State of Connecticut, Plaintiff

v.

Great Oak Farms, Inc., Bankrupt, Defendant

### MEMORANDUM AND ORDER

ROBERT L. KRECHEVSKY,
Bankruptcy Judge.

This case is before the court on a complaint to determine the dischargeability of

a debt. An evidentiary hearing was not held, the parties stipulating to the following facts.

Great Oak Farms, Inc., (Great Oak), the operator of a milk and convenience store, was duly licensed as a Lottery Sales Agent by the State of Connecticut on or about October 19, 1977, and became authorized to sell State lottery tickets. On February 2, 1979, Great Oak received four Instant Lottery Ticket packets for sale. Great Oak ceased all retail sales on June 20, 1979, and filed a voluntary petition in bankruptcy on July 16, 1979. Great Oak owes the plaintiff, Division of Special Revenue of the State of Connecticut (DSR) $1,341.00 for the said lottery tickets.[1]

During the period that Great Oak was in business, funds received from the sale of lottery tickets were commingled with the general revenue from its other sales. The application for a license that Great Oak executed contained nine (9) "conditions for licensing". Conditions one through four state that (1) the license is issued at the discretion of the DSR, (2) the applicant must abide by state statutes and regulations, (3) lottery tickets are to be available for sale during normal business hours, and (4) authorized displays and other material are to be maintained. Conditions six through nine require the applicant (6) to keep records of operations, (7) to allow inspection of the operations by the DSR, and states that (8) the license is revocable, and (9) non-transferable. Condition No. 5 reads in full as follows:

> The applicant understands that all tickets accepted from the Division of Special Revenue, or its distributors or safekeeping depositories, are deemed to have been purchased by the applicant and the purchase price is required to be paid as directed by the Division of Special Revenue, less the appropriate commission discount, if any, unless unsold tickets are returned to the authorized distributor for safekeeping on or before the established deadline.

Based on the foregoing, DSR claims that Great Oak was acting in the capacity of a fiduciary in selling lottery tickets, and that the failure to pay the $1,341.00 owed, when it closed its doors, was due to its fraud, embezzlement, misappropriation or defalcation, and thus not dischargeable under § 17(a)(4) of the Bankruptcy Act of 1898.[2] DSR asserts (1) that a fiduciary obligation is inherent in Great Oak's position as a licensee, a position DSR characterizes as one of trust; and (2) that the conditions enumerated on the application executed by Great Oak "create a body of obligation binding the licensee to a specified course of action". DSR claims that condition No. 5 of this list is of special force. This condition, alleges DSR, "implies, if not explicitly states, that all proceeds of lottery sales, except designated commissions, belong to the State [and] ... the licensee is a fiduciary of the State for the purposes of lottery ticket sales". Implicit in DSR's assertion is a reliance on Conn.Gen.Stat. 12–569 and Administrative Regulations: Operation of A State Lottery Adopted by The Commission on Special Revenue, revised 1976, (Regulations) for its proposition that Great Oak as a lottery sales agent acted in a fiduciary capacity within the meaning of § 17(a)(4). Conn.Gen.Stat. 12–569(b) provides:[3]

> All monies received by lottery sales agents from the sale of lottery tickets constitute property of the state while in such agent's possession. The executive director, in his discretion, may require lottery sales agents to deposit in a spe-

---

**1.** The debt is listed in Schedule A–3 of the petition as a "current billing on an open account".

**2.** "Section 17. *Debts Not Affected by a Discharge.*
   a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... (4) were created by his fraud, embezzlement, misappropriation or defalca-tion while acting as an officer or in any fiduciary capacity; ...."
   The use of the phrase "fiduciary capacity" is continued in 11 U.S.C. 523(a)(4), The Bankruptcy Reform Act of 1978.

**3.** Conn.Gen.Stat. 12–569 was amended in 1979, but the amendments do not affect the issue under consideration.

cial or suspense account in the name of the Division, to the credit of the Division, which the Executive Director is authorized to establish, in institutions designated by him which are legal for the deposit of state funds under section 4–33, all moneys received by agents from the sale of lottery tickets, less the amount of compensation, if any, authorized under subsection (a), and to file with the Division reports of their receipts ánd transactions in the sale of lottery tickets in such form and containing such information as the Executive Director may require.

The statute further authorizes the Executive Director to impose a delinquency assessment of 10% plus 1% per month of any amounts delinquent under regulations provided for by the subsection, and further authorizes the use of collection agents for the collection of delinquent amounts.

The court has taken judicial notice of all the Regulations. Section 12–561–7(a) of the Regulations provides that:

(a) All lottery sales agents ... shall deposit to the credit of a specified state lottery fund in a designated bank all monies received by such agents from the sale of lottery tickets less the amount, if any, retained as compensation for the sale of the tickets or paid out as prizes, and file with the commission or its designated agents reports of their receipts and transaction [sic] in the sale of lottery tickets in such form and containing such information as it may require....

All tickets accepted by an agent from the state lottery or its authorized representatives are deemed to have been purchased by the agent, unless returned to the bank from which they were obtained within the time specified, and the purchase price shall be paid to the state lottery, less the appropriate commission discount and any monies paid out as prizes, if any. The agent is responsible for lost or missing tickets.

Section 12–561–8 of the Regulations spells out the conditions under which a lottery sales agent's license may be revoked. Subsection (a)(2) provides for revocation, suspension or rejection of renewal "(w)henever the agent violates any of the provisions of the act or the rules and regulations and instructions of the state lottery division".

Great Oak asserts that neither the agreement it signed in the form of an application for a lottery sales agent's license nor state statute and Regulations create more than a commission merchant status or agency between DSR and it. Great Oak denies that anything in the arrangement between it and DSR gives rise to a fiduciary capacity such that failure to pay its acknowledged debt to DSR would render such debt nondischargeable within the terms of § 17(a)(4).

Both parties tó the instant action thus agree that dischargeability *vel non* under § 17(a)(4) depends upon a finding by the court that Great Oak either did or did not stand in a fiduciary relationship with DSR. Ever since *Chapman v. Forsyth, et al.*, 43 U.S. (2 How.) 202 [11 L.Ed. 236], decided in 1844 under the Bankruptcy Act of 1841, it has been well settled that "fiduciary capacity" as used in bankruptcy statutes requires an express trust and "... unless there be some additional fact, § 17a(4) does not apply to frauds of agents....", 1A *Collier on Bankruptcy* (14th ed.) ¶ 17.24 at 1708–9. The 1841 Act contained a provision denying discharge for debts created while the bankrupt was acting in a fiduciary capacity. In *Chapman,* the defendants, cotton factors, were sued for the proceeds of 150 bales of cotton shipped to and sold by them as the property of Chapman, the plaintiff. One of the defendants, Forsyth, pleaded as a defense a discharge in bankruptcy. An issue certified to the Supreme Court was whether. "a commission merchant and factor, who sells for others, [is] indebted in a fiduciary capacity within the act, provided he withholds the money received for property sold by him, and which property was sold on account of the owner, and the money received on the owner's account?" *Id.* at 206–207. The Court held:

If the act embraces such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed

in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act....

The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act....

In answer to the second question, then, we say, that a factor, who owes his principal money received on the sale of his goods, is not a fiduciary debtor within the meaning of the act. *Id.* at 208.

In accord with *Chapman*, are *Neal v. Clark*, 95 U.S. 704 [24 L.Ed. 586] (1877); *Hennequin v. Clews*, 111 U.S. 676 [4 S.Ct. 576, 28 L.Ed. 565] (1883); *Noble v. Hammond*, 129 U.S. 65 [9 S.Ct. 235, 32 L.Ed. 621] (1888); and *Upshur v. Briscoe*, 138 U.S. 365 [11 S.Ct. 313, 34 L.Ed. 931] (1890), all construing "fiduciary capacity" under the discharge provisions of the Bankruptcy Act of 1867. Typical is *Noble v. Hammond*, which involved the failure of an agent to pay over money collected on behalf of principals. Noble, the plaintiff in error, pleaded a discharge in bankruptcy as a defense to the alleged debt. At issue were the instructions of the principals to the bankrupt with respect to the funds collected. The Court held that the rule of *Chapman* applied. Moreover,

The finding of the jury, that the agreement of the plaintiff in error was to collect the money and keep it until the defendants in error called for it, cannot be taken to imply an obligation to keep and deliver to them the identical bills or coins. Even if the agreement between the parties might be construed as creating a trust in some sense, it was clearly not such a trust as comes within the provisions of the bankruptcy act. Nor can the subsequent mingling, by the plaintiff in error, of the money collected

with his own, constitute the *actual positive* fraud contemplated by that act, but only such an *implied* fraud as is involved in most, or all, cases of conversion of property or of breach of contract. *Id.* [129 U.S.] at 70 [9 S.Ct. at 237].

Three Supreme Court cases extended the holding in *Chapman* to § 17(a)(4) of the Bankruptcy Act of 1898. *Crawford, et al. v. Burke*, 195 U.S. 176 [25 S.Ct. 9, 49 L.Ed. 147] (1904); *Tindle v. Birkett*, 205 U.S. 183 [27 S.Ct. 493, 51 L.Ed. 762] (1906); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 [55 S.Ct. 151, 79 L.Ed. 393] (1934). The *Davis* case involved an automobile dealer who had entered upon a "trust receipt" financing arrangement with a lending company. His failure to turn over the proceeds from the sale of a motor vehicle held under a trust receipt led the lender to bring an action for conversion and for violation of § 17(a)(4). Mr. Justice Cardozo, after reviewing the decisional history of the *Chapman* rule, stated:

It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*. He must have been a trustee before the wrong and without reference thereto.... Was petitioner a trustee in that strict and narrow sense?

We think plainly he was not, though multiplicity of documents may obscure his relation if the probe is superficial. The only writing at all suggestive of a trust is the one that is characterized as a trust receipt. What effect would be given to it if it stood alone, there is no occasion to consider. It does not stand alone, but is a member of a group which must be read with a collective meaning.... The resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust. *Id.* [293 U.S.] at 333, 334 [55 S.Ct. at 154, 154].

The United States Supreme Court decisions reviewed herein demonstrate beyond peradventure that the rule in *Chapman* has been fixed by judicial construction for well over a century. For a bankrupt to fall

within the prohibition of § 17(a)(4) with respect to fiduciary capacity, there must be an express or technical trust, not a trust implied in law or from the terms of a contract. Moreover, the bankrupt must have been a trustee under such an express trust before the dereliction occurred which is alleged against him.

A recent line of lower court cases, however, has limited the application of the *Chapman* rule. These cases have held that where *state statutes* may be construed to impose a fiduciary capacity upon a bankrupt, debts incurred by the bankrupt while acting in such capacity are not dischargeable under § 17(a)(4). *In re Morris Ketchum, Jr. and Associates*, 409 F.Supp. 743 (S.D.N.Y.1975); *In re Romero*, 535 F.2d 618 (10th Cir.1976); *In the Matter of Kawcynski*, 442 F.Supp. 413 (W.D.N.Y.1977); Other cases, however, have rejected the rationale of statutory imposition of fiduciary capacity. *In re Thornton*, 544 F.2d 1005 (9th Cir.1976); *In the Matter of Dloogoff*, 600 F.2d 166 (8th Cir.1979); *In the Matter of Angelle*, 610 F.2d 1335 (5th Cir. 1980). A discussion of these cases is required by the fact that in the instant case, it is a Connecticut statute that arguably imposes a fiduciary capacity upon Great Oak such as to render its debt nondischargeable.

In *Ketchum, supra*, a contractor received payments from the New York Zoological Society for architectural, engineering and landscaping services and failed to pay them over to the subcontractor who performed some of the work. The contractor then filed a petition in bankruptcy and received a discharge. The district court held that by dint of the following language of the New York Lien Law, "[funds] received by a contractor under or in connection with a contract for an improvement of real property ... constitute assets of a trust ... for payment of claims of subcontractors", use of such funds for purposes other than payment of the subcontractor was a violation of § 17(a)(4). The case was held to be distinguishable from those in the *Chapman* line.

Once the defendant [contractor] took affirmative steps to secure funds from the Zoo, however, he took on new obligations with respect to [the subcontractor]. He was now a trustee of particular funds which New York law required him to pay to subcontractors; he was prohibited from commingling the trust funds ... and, under New York Lien Law § 79–a(1)(b) was obliged to turn these funds over to the subcontractor within thirty-one days of the date they were received. . Failure to do so may have constituted a larceny. New York Lien Law 79–a(1). *Ketchum, supra*, at 746.

In *Romero, supra*, the Court of Appeals for the Tenth Circuit held that a New Mexico statute providing for revocation or suspension of a contractor's license on the ground of "diversion of funds or property received for prosecution or completion of a specific contract" was sufficient to impose a fiduciary capacity upon Romero, the bankrupt contractor, within the meaning of § 17(a)(4), and that the bankruptcy court's finding to that effect was not clearly erroneous. *Id.* at 621–622.

*Matter of Kawcynski, supra*, followed *Ketchum* in its construing of the New York Lien Law to impose fiduciary duties upon a contractor who failed to pay amounts received to subcontractors.

In contrast to the *Ketchum* line of cases are *Thornton; Dloogoff*, and *Angelle, supra*. *Thornton* involved a bankrupt employer who failed to pay to a union trust fund money deducted from employees' wages pursuant to a bargaining agreement. The Court of Appeals of the Ninth Circuit rejected the argument of the union trustees that the existence of an Oregon statute making it unlawful for an employer wilfully to fail to make required payments to such a trust fund brought the employer within the proscription of § 17(a)(4). Despite such a statute, the court held that Thornton's relationship with the union was purely contractual, and applied the *Chapman* rule as follows:

The term "fiduciary" under this section has been consistently construed as limited to express trusts and not to trusts

imposed *ex maleficio*—that is, trusts imposed because of an act of wrongdoing out of which the debt arose—or to trusts implied by law from contracts. The general characteristics of an express trust are (1) sufficient words to create a trust; (2) a definite subject; and (3) a certain and ascertained object or res. The intent to create a trust relationship rather than a contractual relationship is the key element in determining the existence of an express trust. (citations omitted) *Id.* at 1007.

*Dloogoff* raised the issue of misapplication of funds paid to a contractor for building a garage. After analyzing the recent case law reviewed *supra,* the Eighth Circuit noted that in deciding these cases, courts relied upon state law to establish fiduciary capacity, and held that by judicial construction of the Nebraska Supreme Court, the Nebraska statute alleged by the plaintiff to create a trust had no such effect.

In *Angelle,* yet another case involving misapplication of funds paid to a builder, the Court of Appeals of the Fifth Circuit overruled the District Court's holding that the builder was a fiduciary under a Louisiana statute. The court made reference to the *Chapman* rule and specifically concluded that *Romero, supra* was wrongly decided. *Id.* at 1340.

An analysis of this decisional law suggests the following: (1) in every recent case where courts have found an express trust and/or a fiduciary capacity imposed by statute, the statute involved cash paid to a contractor-trustee to be employed for the benefit of subcontractors, (2) in no instance has a trust been found where "goods" are furnished for sale, (3) in the New York cases, the fact that criminal sanctions obtained for violation of statute was stressed, (4) the New York Lien Law specifically stated that the funds received constituted assets of a trust, (5) the preponderance of authority at the court of appeals level has not found the express trust required by the *Chapman* rule to be created

through noncompliance with legislative enactments.

The Connecticut statute and Regulations providing for appointment and control of lottery sales agents differs substantially from statutes where courts have found express trusts. The context of the construction trade where monies are delivered to be turned over to third parties is absent. No money was received by Great Oak for the benefit of a third party. On the contrary, goods in the form of tickets were supplied to Great Oak for sale. The statute employs no language of trust and establishes no clearly defined res. No criminal sanctions are imposed by statute for failure to pay ticket receipts to DSR. While it is true that both the statute and Regulations provide for the segregation of ticket receipts, failure to segregate such receipts may, at most, result in revocation of the agent's license to sell lottery tickets. A prohibition against commingling of funds has been held not to be an indicium of a trust in the bankruptcy sense. *Noble v. Hammond, supra,* at 898.

Both the application agreement condition No. 5 and the Regulation § 12–561–7(a) provide that the tickets accepted by Great Oak "are deemed to have been *purchased* by the applicant" if not returned. It is most significant, in view of the long decisional history of the *Chapman* rule, that the statute and Regulations uniformly employ the language of agency and not of trust. Such language is consistent with the establishment of a commission sales arrangement and inconsistent with the establishment of a fiduciary relationship.

Given the apparent conflict that exists between the courts of appeal that have decided similar issues, and the fact that this appears to be a case of first impression in this district, it appears to the court that application of the *Chapman* rule is appropriate in the case before me. The court holds that Great Oak acted in the capacity of agent or commission merchant in its sales of state lottery tickets, and that Conn.Gen.Stat. 12–569 and supporting Regulations fail to create an express trust or a fiduciary capacity within the meaning of

the *Chapman* rule or § 17(a)(4) of the Bankruptcy Act of 1898. Having found no fiduciary capacity imposed upon Great Oak, the court need not decide the question whether the debt owed to DSR was created by Great Oak's fraud, embezzlement, misappropriation or defalcation. The debt is dischargeable, and it is

SO ORDERED.

Dated at Hartford, Connecticut, this 29th day of April, 1980.

(s) Robert L. Krechevsky
ROBERT L. KRECHEVSKY
UNITED STATES BANKRUPT-
CY JUDGE