In re Elias DOBRAYEL, Debtor.

David Sandak, D.D.S., Plaintiff,

v.

Elias Dobrayel, Defendants.

Bankruptcy No. 01 B 21116 ASH.
Adversary No. 01–5076A.

United States Bankruptcy Court,
S.D. New York.

Dec. 9, 2002.

Sweeney, Cohn, Stahl & Vaccaro, By Julius W. Cohn, White Plains, NY, for Plaintiff.

Elias M. Dobrayel, Mahopac, NY, Pro Se.

## CORRECTED DECISION ON LIABILITY AND DISCHARGEABILITY AFTER TRIAL

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Plaintiff David Sandak, a dentist ("Sandak"), commenced this adversary proceeding against debtor-defendant Elias M. Dobrayel, a contractor ("Dobrayel"), (1) to establish Dobrayel's liability to Sandak in connection with Dobrayel's undertaking to construct office space for Sandak's new dental practice, and (2) for a determination that all or a portion of such liability is nondischargeable under 11 U.S.C. § 523(a)(2). Dobrayel asserted a counterclaim against Sandak for $50,000 on account of work performed. The case was tried to the Court and, at the Court's request, plaintiff submitted proposed post-trial findings of fact based on the evidence.

### Jurisdiction

The Court has core jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).

### Findings of Fact and Conclusions of Law

The following constitute the Court's findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Background Findings

Sandak signed a lease for a dental office at 10 Old Mamaroneck Road, White Plains, New York (the "Premises") in November 1997. Some time in October or November 1997 Sandak signed a contract with Serge Wisniewski ("Wisniewski") to design the interior space for the Premises for a dental office. In January 1998 the interior space of the Premises was substantially demolished in preparation for construction of Sandak's new dental office. Wisniewski produced architectural drawings dated February 6, 1998 for Sandak's dental office (the "Wisniewski Plans") consisting of sheet "1 of 3" covering interior partitions, sheet "2 of 3" entitled "plumbing plan," and sheet "3 of 3" entitled "electrical and reflected ceiling plan."

In early February 1998 Sandak was introduced to Dobrayel by Joel Blauvert, a dental equipment salesperson. Dobrayel prepared and submitted a proposal to Sandak dated February 16, 1998 (Trial Ex. 9) with a covering note asking Sandak to sign and return a copy. Although the copy of the February 16, 1998 proposal marked in evidence as Trial Ex. 9 (presumably the copy retained by Sandak) was not signed by Sandak, I find as facts that Sandak accepted the proposal, the parties operated under the proposal and the proposal constituted a binding contract between them. Accordingly, I shall refer to the proposal as the "February 16, 1998 Contract" or simply the "Contract." Several important

features of the Contract merit findings as background.

The February 16, 1998 Contract stated specifically that it was "ACCORDING TO THE PLANS PROVIDED TO ME BY THE DESIGNER SERGE WISNIEW-SKI DATED FEB. 6, 1998." At the trial Dobrayel produced one of the three sheets comprising the Wisniewski Plans (sheet 3 of 3) and testified that this single sheet was the only one of the three sheets comprising the Wisniewski Plans that he had received prior to preparing the February 16, 1998 Contract.[1] I reject Dobrayel's testimony on this point as incredible and find as a fact that Dobrayel received and based his February 16, 1998 proposal upon all three sheets comprising the Wisniewski Plans. Dobrayel's February 16 proposal covers all aspects of the renovation of the Premises covered by the Wisniewski Plans. Sheet 3 of 3 covered only the lighting and electrical portion of the renovation project. It is inconceivable that Dobrayel could or would have issued a contract proposal covering the entire job lacking design specifications for two-thirds of the job. Further, it would have been quite impossible for him to partially perform all phases of the renovation lacking plans and specifications for two-thirds of the project.

The February 16, 1998 Contract provided that Dobrayel would complete the entire renovation specified in the Wisniewski Plans for the sum of $118,000. The contract called for an initial payment of $39,000 and nine weekly payments of $8,777 each. In accordance with the Contract, Sandak paid Dobrayel by check $39,000 on February 25, 1998 and nine consecutive weekly payments of $8,777 commencing June 19 and concluding August 14, 1998.

The February 16, 1998 Contract provided that "THE TIME TO COMPLETE THE JOB IS 10 WEEKS STARTING THE DAY AFTER PLAN & PERMIT APPROVAL." The Wisniewski Plans were filed with the Department of Buildings, City of White Plains, on March 4, 1998 and were approved by Building Permit dated March 23, 1998. The renovation was begun by Dobrayel, but completion of the work was delayed by certain construction modification in the building which was the obligation of the landlord, including a demising wall to separate Sandak's space from the rest of the building and certain plumbing work to prevent backflow. There is no dispute that all of the delaying work obligations of the landlord were fully completed before the end of August 1998.[2]

While it may have delayed the renovation somewhat, the work required of the landlord did not prevent Dobrayel from commencing work on the renovation. Thus it was that by the beginning of September 1998 Dobrayel had received payment of the entire $118,000 payable under the February 16, 1998 Contract for completion of the entire renovation, but he had completed less than 60% of the work he was required to perform. Although he demanded and received from Sandak additional payments totaling $58,505 after September 1, 1998, Dobrayel did little if any additional work on the Premises and never completed the project.

As amplified below, Sandak was greatly prejudiced by the delay in completion of

---

1. He also insisted that he received sheet 3 of 3 from Sandak, not Wisniewski, despite his typewritten recitation quoted above stating that the Plans had been provided to him by Wisniewski.

2. Since Dobrayel was working on the Premises, the landlord hired Dobrayel to construct the demising wall and paid him $2,500 for doing so.

his office space as he embarked upon his new career. He was able to begin his practice part-time by utilizing space made available to him in the nearby office of his father, a dentist who had long engaged in the general practice of dentistry. Since this part-time arrangement was costly to Sandak in a number of respects, he was desperately anxious to complete the renovation and move into his own office space. Nonetheless, Sandak remained confident in the belief that Dobrayel would honor his contractual obligations and complete the work, for Dobrayel repeatedly promised to do so. After months of inattention and little if any progress, in August 1999 Sandak learned that Dobrayel had undertaken and completed a renovation project for another dentist to whom Sandak had introduced Dobrayel. Finally, Sandak's attorney wrote a letter dated October 7, 1999 demanding that Dobrayel complete the work. By letter dated October 9, 1999 Dobrayel replied, stating that he would not complete the job unless Sandak paid him an additional $18,600.

Persuaded by Dobrayel's attempt to extract a further $18,600 in addition to the $176,505 which he had already paid, Sandak finally came to the conclusion that Dobrayel would never complete the project. He then hired another contractor, Chris Moran. Moran completed the new dental office in accordance with the Wisniewski Plans at a total cost to Sandak of $49,252, of which $35,630 was paid to Moran and $13,622 was paid to three subcontractors who had been hired but not fully paid by Dobrayel.

### Credibility

Before turning to the Court's ultimate findings and conclusions on liability for breach of contract, fraud, and dischargeability under Section 523(a)(2) and (4), it is important to note that the critical evidence bearing upon these issues was the testimony of Sandak and Moran, in support of plaintiff's claims, and Dobrayel on his own behalf in opposition.

I found Sandak to be a thoroughly credible person. Nothing in the trial evidence or in his demeanor gave rise to any doubt as to Sandak's credibility as a witness or his good faith in connection with his dealings with Dobrayel. Moreover, most if not all of Sandak's testimony on critical issues, such as Dobrayel's representations concerning the need for Contract price modifications due to changes in regulations by the White Plains Building Department, Dobrayel's continuing assurances that he would expeditiously complete the job, and the condition of the Premises in September 1998 and September 1999, were either confirmed or not contested by Dobrayel in his testimony.

Equally compelling was the credibility of Moran, whose testimony was clear, concise and, in important instances, confirmed by the photographic evidence.

By contrast, as is already evident from the text under Background Findings, above, I found Dobrayel's testimony to be unworthy of belief on many of the critical issues in the case. For example, his testimony concerning the lighting fixture housings and other physical aspects of the Premises was confounded by the photographic evidence. As noted above, his testimony that his February 16, 1998 proposal, which became the Contract, was based on only one of the three sheets comprising the Wisniewski Plans was inherently unbelievable and, in part, refuted by his own recitation in the Contract which he drafted. The importance of this point cannot be overstated, since Dobrayel's justification to Sandak in the fall of 1998 and at trial for his demands aggregating $58,505 in excess of the Contract price was predicated on his claim that the February 16,

1998 Contract was based on plans that were materially different from the plans approved by the White Plains Building Department on March 23, 1998. This point is evident from questions put by the Court to Dobrayel at the trial:

THE COURT: Well, do you understand that that's what we're trying to get at? We're trying to find out whether or not the three pages of plans, E–2, which you submitted to the Department in White Plains constituted a deviation from the February 6, 1998 plans on the basis of which you gave your contract proposal E–9.

MR. DOBRAYEL: I understand.

THE COURT: You understand that?

MR. DOBRAYEL: Yes, I do.

(Trial Tr. at 311)

It is also significant to note that, although the White Plains Building Department gave final approval to the Wisniewski Plans (all three sheets) on March 23, 1998, purportedly imposing requirements based on alleged new regulations increasing the cost of the Project by some $58,000 more than the Contract price, Dobrayel failed to mention any of the alleged new requirements of the Building Department or resulting increase in cost until mid-September 1998, after Sandak had paid 100% of the Contract price and Dobrayel had completed approximately 50% of the work. Dobrayel's crucial testimony concerning the alleged changes in regulations or building requirements by the Building Department of the City of White Plains was contradicted by the testimony of Moran and was never substantiated by any evidence of any kind showing or even suggesting that there had been any change in Building Department rules or regulations during the relevant period. Had there been such changes in Building Department rules and regulations justifying Dobrayel's demands for additional payments, it would have been a simple matter to present evidence of the changes, such as the amended regulations themselves or testimony from Building Department personnel. However, no such evidence was proffered. Moreover, although Dobrayel claimed that certain notes on the Wisniewski Plans bearing the Building Department's approval stamp dated March 23, 1998 were not on the single sheet of the Wisniewski Plans on which he based his February 16, 1998 proposal, he made no effort to explain at trial which, if any, of the new notations resulted in or had any connection at all with the purported changes for which he billed Sandak an additional $58,505.

## *Discussion*

### I. *Breach of Contract*

The evidence established conclusively and I find as a fact that Dobrayel committed a gross and willful breach of the February 16, 1998 Contract. The Contract required Dobrayel to complete the renovation by the end of May 1998, which was ten weeks after March 23, 1998, the date of the grant of the building permit. Sandak fully performed his part of the bargain by paying the entire amount due under the Contract, $118,000, by August 14, 1998. Circumstances beyond the control of either party—the landlord's failure to complete certain work on the building—delayed the project until August 1998 when the landlord completed the building work. Assuming that Dobrayel were entitled to take the entire ten-week Contract period commencing September 1, the Contract deadline to complete was November 8, 1998. Since the renovation work was somewhere between 50% and 60% completed before the end of August, the job should have been finished sometime during October 1998.

But it was not. Instead of pressing on with the job in September 1998, Dobrayel initiated the first of a series of demands for additional compensation for alleged

"changes" in the Contract or Contract specifications relating to duct work for the HVAC system, electrical fireboxes, an additional architect's fee, ceiling tiles, electrical fixtures and supplies, flooring, granite tile, glues and grout, doorway saddles, further electrical fixtures and under-cabinet lighting. Between September 28, 1998 and April 30, 1999 Dobrayel demanded and Sandak made payments exceeding the Contract amount totaling $58,505.

During this period (September 1998 through April 1999) little progress was made on the job. From May through July 1999 almost no work was done by Dobrayel or his personnel at the Premises. By his own admission at trial, Dobrayel performed no further work at all on the Sandak project after mid-July 1999.

The only justification proffered by Dobrayel for his failure to complete the project between September 1998 and February 1999 was the series of alleged Contract changes for which he demanded additional recompense during that period. Putting aside (until point II C, below) the question of Dobrayel's bad faith in demanding additional compensation in respect of these alleged Contract changes, the last of the alleged changes was resolved in a meeting on February 18, 1999. Dobrayel offered no excuse of any sort for his delay during and after February 1999 or his total abandonment of the project in mid-July 1999. At the trial Dobrayel offered no documentary evidence and no testimony in support of either his October 7, 1999 letter demanding payment of an additional $18,600 or his $50,000 counterclaim.

· Perhaps the most striking trial evidence of Dobrayel's breach of the February 16, 1998 Contract was a home video taken by Sandak on September 12, 1999. The video, which was received in evidence and viewed by the Court during the trial in the presence of both Sandak and Dobrayel, showed quite clearly what appeared to be every surface of floor, walls and ceilings of every part of Sandak's office Premises in the condition in which they were abandoned by Dobrayel. The verity of the aphorism "a picture is worth a thousand words" is underscored by this video and informs my view that no purpose will be served by my attempting to describe the Premises as shown in the video. Suffice it to say that the condition of the Premises as of September 12, 1999 was appalling. Equally shocking was the testimony of Sandak that the overall condition of the Premises as graphically shown on the video as of September 1999 was not materially different from the condition of the Premises in September 1998. Moreover, Dobrayel did not dispute Sandak's testimony that the condition of the Premises in September 1999, as shown in the video, did not represent any material change or advance in the progress of the renovation from September 1998.

The foregoing facts give rise to a strong inference that Dobrayel, having performed less than 60% of the work required of him to complete the job, determined at some point in time that he would simply pocket the money and walk away from the job, since he had already been paid the full contract price due him under the February 16, 1998 Contract. In fact, that is what he did. The trial evidence of Dobrayel's *mala fides* in connection with his demands for additional compensation commencing in September 1998, analyzed in point II C of this decision, compels the conclusion, and I so find, that Dobrayel's determination to abandon the Contract was made shortly after he had received the last Contract payment on August 14, 1998.

## II. *Non-dischargeable Liability*

### A. *Section 523(a)(2) of the Bankruptcy Code*

Stated generally, a discharge under subsection (a) of Section 727 of the Bank-

ruptcy Code relieves the debtor from all pre-petition debts and liabilities. 11 U.S.C. § 727(b). Exceptions to such discharge are provided in Section 523(a) of the Bankruptcy Code. Debts and liabilities based solely upon breach of contract are not excepted from discharge under Section 523(a).

Sandak's claim of non-dischargeability is based on Section 523(a)(2), concerning fraud. The statute provides in relevant part as follows:

(a) A discharge under Section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud....

■ The three terms used in subsection (A) embody somewhat differing concepts, and Congress' "use of the disjunctive 'or' evidences [an intent] to deny a discharge under *any* [such term]...." *Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr.S.D.N.Y.1996) (emphasis added). While "actual fraud" generally requires proving the "five fingers of fraud," [3] this Court has held that such elements "need not be shown to establish either 'false pretense' or 'false representation.'" *Gentry v. Kovler*, 249 B.R. 238, 260 (Bankr.S.D.N.Y.2000)

■ Proof of debtor's making "false or misleading statement about something, usually with the intent to deceive," will be sufficient to find false representations. BLACK'S LAW DICTIONARY 619 (7th ed.1999).

False pretense, on the other hand, "may be defined as conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property." *Gentry,* 249 B.R. at 261. Perhaps more fitting to the case at bar, false pretense is "the product of multiple events, acts, or representations undertaken by the debtor which purposely create a contrived and misleading understanding of a transaction that ... wrongfully induces the creditor to extend credit to the debtor." *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D.Colo.1990) *aff'd in part, rev'd in part Evans v. Dunston (In re Dunston)*, 146 B.R. 269 (D.Colo.1992), *quoted in Soliz,* 201 B.R. at 369.

■ A legal issue arises in the context of this case from the statutory language in subsection (2) of Section 523(a) "for money, property ... *to the extent obtained*" by fraud (emphasis supplied). The statute clearly applies to money which the defendant himself "obtained" from the plaintiff. The question is whether consequential damages sustained by plaintiff as a direct consequence of defendant's fraud, but not literally "obtained" by defendant in the sense of having been paid over to defendant, are within the scope of a debt which is excepted from discharge under Section 523(a). The Supreme Court decision in *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) and other case law make clear that compensatory damages actually sustained by plaintiff as a consequence of defendants' fraud are within the scope of the exception to discharge in Section 523(a)(2). " 'To the extent obtained by' modifies 'money, property, services, or ... credit'—not 'any

---

**3.** The classic five elements of fraud in this context would be (1) a representation made by debtor to creditor; (2) debtor's knowledge of the falsity when it was made; (3) debtor's intent to deceive in making such representation; (4) creditor's justifiable reliance upon it, *see Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (holding that Section 523(a)(2)(A) requires justifiable, but not reasonable, reliance); and (5) debtor's suffering of damage as a result.

debt'—so that the exception encompasses 'any debt ... for money, property, services, or ... credit, to the extent [that the money, property, services, or ... credit is] obtained by' fraud." *Cohen*, 523 U.S. at 218, 118 S.Ct. 1212 (alteration in original). "Once it is established that the specific money or property has been obtained by fraud ... '*any debt*' arising therefrom is excepted from discharge." *Id.* (emphasis added). "The Bankruptcy Code's provisions for discharge stop short of certain *debts resulting from* 'false pretenses, a false representation, or actual fraud.' " *Field v. Mans*, 516 U.S. 59, 61, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (emphasis added) *quoted in Cohen*, 523 U.S. at 218, 118 S.Ct. 1212. *See also Pleasants v. Kendrick*, 219 F.3d 372, 375 (4th Cir.2000) ("This language [from *Field* and *Cohen* ] is broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor"); *Morlang v. Cox*, 222 B.R. 83, 86 (W.D.Va.1998) (finding that the Supreme Court in *Cohen* "held that non-dischargeability should be applied to 'any debt' related to the fraud ...").

This Court has previously had the opportunity to rule on this matter and has adhered to the Supreme Court's interpretation of the scope of 11 U.S.C. 523(a)(2)(A). *See Race Place of Danbury v. Scheller (In re Scheller)*, 265 B.R. 39, 54 (Bankr.S.D.N.Y.2001) (finding that the Supreme Court in *Cohen* "specifically rejected the notion that a debt for money or property obtained by fraud is limited to the value of the money or property received by the debtor ..."); *Gentry*, 249 B.R. at 263 (quoting *Cohen* ) (" '[A]ny debt ... for money, property, services, or ... credit, to the extent obtained by' fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may ex-

ceed the value obtained by the debtor."). To hold otherwise would disregard Congress' intent because in creating the statute, "Congress evidently concluded that the creditor's interest in recovering full payment of debts in these [fraud] categories outweighed the debtors' interest in a 'fresh start.' " *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). It is "unlikely that Congress ... would have favored the interest in giving perpetrators of fraud a fresh start over the interest of protecting victims of fraud." *Id. quoted in Cohen*, 523 U.S. at 223, 118 S.Ct. 1212.

■■■■ A creditor alleging non-dischargeability under Section 523(a)(2) must prove the elements necessary by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. at 285, 111 S.Ct. 654; *In re Schwartz and Meyers*, 130 B.R. 416, 422 (Bankr.S.D.N.Y.1991). Once a creditor has established a *prima facie* case under Section 523(a)(2), the debtor then has the burden of going forward with his defense. *See Matter of Newmark*, 20 B.R. 842, 852 (Bankr.E.D.N.Y.1982); *Carini v. Matera*, 592 F.2d 378, 380–81 (7th Cir.1979).

### B. *Section 523(a)(4); failure to plead*

Although Sandak's claims for non-dischargeability have been brought under Section 523(a)(2), one of his claims based on Dobrayel's failure to pay three subcontractors (discussed under point II C 6, below) merits analysis under Section 523(a)(4) which, in relevant part, excepts from discharge any debt for "defalcation while acting in a fiduciary capacity." First the Court must determine whether the debtor was acting in a "fiduciary capacity" when the wrongful act giving rise to the claim was committed. *In re Scheller*, 265 B.R. 39, 52.

■ The meaning of "fiduciary capacity" under Federal laws is more restricted than under the more general common law or state law definitions. *Stone v. Stone (In re Stone)*, 94 B.R. 298, 302 (S.D.N.Y.1988); *In re Midkiff*, 86 B.R. 239, 241 (Bankr.D.Colo.1988); *In re Currin*, 55 B.R. 928, 932 (Bankr.D.Colo.1985); *Zohlman v. Zoldan (In re Zoldan)*, 221 B.R. 79, 84 (Bankr.S.D.N.Y.1998) ("The concept of fiduciary under Section 523(a)(4) . . . is far narrower in scope than under state law"). Thus, fiduciary capacity contemplated under Section 523(a)(4) applies only to technical or express trusts and not to trusts *ex maleficio*. *In re Scheller*, 265 B.R. 39, 52 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934)); *In re Zoldan*, 221 B.R. 79, 84; *Matter of Kawczynski*, 442 F.Supp. 413, 416 (W.D.N.Y. 1977); *LSP Inv. Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir.1993) (concept of fiduciary under Section 523(a)(4) is narrowly construed and applies only to technical or express trusts and not to those which law implies from contract); *In re Taylor*, 58 B.R. 849, 852 (Bankr.E.D.Va.1986) (Section 523(a)(4) requires proof of express or technical trust) (citing 3 COLLIER ON BANKRUPTCY ¶ 523.14[1][c], p. 523–108); *Kwiat v. Doucette*, 81 B.R. 184, 188 (D.Mass.1987) (same); *In re Currin*, 55 B.R. 928, 932 (same); *In re Hurbace*, 61 B.R. 563, 565 (Bankr.W.D.Tex.1986) (same); *In re Kelley*, 84 B.R. 225, 229 (Bankr.M.D.Fla.1988) (same); *In re Anderson*, 64 B.R. 331, 334 (Bankr.N.D.Ill.1986) (same); 4 COLLIER ON BANKRUPTCY, ¶ 523.10[1][c], p. 523–72 (15 ed. rev.2002). Such technical or express trusts must exist prior to and independently of the wrongful conduct giving rise to the claim of non-dischargeable debt. *In re Scheller*, 265 B.R. at 52; *Zohlman v. Zoldan*, 226 B.R. 767, 773 (S.D.N.Y.1998) (trusts must exist prior to the wrongdoing); *Matter of Kawczynski*, 442 F.Supp. 413, 416; *In re Casey*, 181 B.R. 763, 766 (Bankr.S.D.N.Y.1995) ("the trust must predate and exist apart from the act from which the underlying indebtedness arose"); *In re Bennett*, 989 F.2d 779, 784 (the trust must exist prior to any wrongdoing and "without reference to" the wrongdoing); *In re Marshall*, 24 B.R. 105, 107 (Bankr. W.D.Mo.1982); *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir.1976) (same); 4 COLLIER ON BANKRUPTCY, ¶ 523.10[1][c], p. 523–72 (fiduciary capacity in 523(a)(4) applies only to express, technical or special trusts).

■ Although the definition of fiduciary capacity is a matter of Federal law, state law may be consulted in determining whether and when express or technical trusts exist in "this strict sense." *In re Scheller*, 265 B.R. at 52 ("State law is to be consulted to determine when a trust in this strict sense exists") (citing *Zohlman v. Zoldan*, 226 B.R. at 773 (S.D.N.Y.1998)); *In re Stone*, 94 B.R. 298, 302; *Krishnamurthy v. Nimmagadda (In re Krishnamurthy)*, 209 B.R. 714, 722 (9th Cir. BAP 1997) (determining whether the relationship is fiduciary under Section 523(a)(4) is an issue of Federal law for which state law can be consulted); *Ragsdale v. Haller (In re Ragsdale)*, 780 F.2d 794, 796 (9th Cir. 1986) (same); *Smith v. Young (In re Young)*, 208 B.R. 189, 204 (Bankr.S.D.Cal. 1997) (same); *In re Schnitz*, 52 B.R. 951, 955 (W.D.Mo.1985) (in determining fiduciary capacity, state law is "important"); *In re Marshall*, 24 B.R. 105, 107 (State law is "helpful" in determining fiduciary capacity). However, the applicable state law that creates a fiduciary relationship must clearly enumerate the fiduciary duties and identify the trust res. *Johnson v. Woldman*, 158 B.R. 992, 996 (N.D.Ill.1993); *Matter of Kawczynski*, 442 F.Supp. at 416 ("To qualify as a fiduciary under [the for-

mer of Section 523(a)(4) ], the trustee must have duties which are independent of any contractual obligations between the parties and which are imposed prior to rather than by virtue of any claim of [wrongdoing]"); 4 COLLIER ON BANKRUPTCY, ¶ 523.10[1][c], p. 523–72.

The instant case involves Article 3–A of New York Lien Law ("Article 3–A"), which creates a trust as soon as a contractor receives funds for the improvement of real property.[4] It imposes "extensive" and "affirmative fiduciary duties" on the trustee.[5] *Matter of Kawczynski*, 442 F.Supp. at 417; *Universal Maintenance, Inc. v. Amherst Painting, Inc.*, 1995 WL 737927, at *3, 1995 U.S. Dist. LEXIS 18530, at *8–9 (W.D.N.Y. Dec. 6, 1995) ("The statute imposes certain fiduciary duties on contractors in the handling of funds for the benefit of all claimants"); *Carey Lumber Co. v. Bell*, 615 F.2d 370, 374 (5th Cir.1980) (holding that the Oklahoma statute like the New York Lien law charges the trustee with affirmative duties in applying the trust funds). It clearly identifies the trust res as the funds received by the contractor for the improvement of real property.[6] *Matter of Kawczynski*, 442 F.Supp. 413, 417; *Burt Building Material Corporation v. Silba (In re Silba)*, 170 B.R. 195, 200 (Bankr. E.D.N.Y.1994) ("the funds received by . . .[a] contractor for the . . . improvement of real property in New York constitute assets of a trust"); *Universal Mainte-*

*nance, Inc. v. Amherst Painting, Inc.*, 1995 WL 737927, at *3, 1995 U.S. Dist. LEXIS 18530, at *8; *Carey Lumber Co. v. Bell*, 615 F.2d at 374 (noting that the New York Lien law clearly defines the trust res). A fiduciary relationship under Article 3–A exists prior to and independently of the wrongful conduct because the trustee's duties begin as soon as he receives the funds for the improvement of real property.[7] *Matter of Kawczynski*, 442 F.Supp. at 417 ("the Lien Law makes clear that the trust arises prior to rather than by virtue of any claim" of wrongdoing); *Clarke & Rapuano v. Ketchum (In re Ketchum)*, 409 F.Supp. 743, 746 (S.D.N.Y. 1975) ("Once the defendant [the contractor] took affirmative steps to secure funds from [the owner] . . . he took on new obligations with respect to C & R [the subcontractor]. He was now a trustee of particular funds which New York law required him to pay to subcontractors"); *In re Angelle*, 610 F.2d 1335, 1340–41 (5th Cir.1980) (noting that under New York Lien law, a trust clearly arises independently of and prior to the wrongful conduct).

Hence, Article 3–A clearly creates an express trust within the meaning of Section 523(a)(4). *Matter of Kawczynski*, 442 F.Supp. at 417 (the trust relationship is expressly imposed on contractors by "unambiguous" statutory language); *Irr Supply Centers, Inc. v. Phipps (In re Phipps)*, 217 B.R. 427, 432 (Bankr.W.D.N.Y.1998) (upholding the ruling in *Matter of Kaw-*

---

4. "The funds . . . received by a contractor under or in connection with a contract for an improvement of real property . . . shall constitute assets of a trust." N.Y. LIEN LAW § 70–1 (Consol.2002).

5. N.Y. LIEN LAW § 75 requires a trustee to keep books or records of every trust of which he is trustee and lists mandated contents of books or records. N.Y. LIEN LAW § 75 (Consol.2002).

6. "The funds . . . received by a contractor under or in connection with a contract for an improvement of real property . . . shall constitute assets of a trust." N.Y. LIEN LAW § 70–1 (Consol.2002).

7. "Every such trust shall commence at the time when any asset thereof comes into existence, whether or not there shall be at that time any beneficiary of the trust." N.Y. LIEN LAW § 70–3 (Consol.2002).

*czynski* ); *In re Grosso,* 9 B.R. 815, 820 (Bankr.N.D.N.Y.1981) ("Article 3–A of the New York Lien Law ... creates an express statutory trust"); *In re Ketchum,* 409 F.Supp. at 746 (holding that defendant debtor became a trustee of particular funds to pay to subcontractors under this law); *Carey Lumber Co. v. Bell,* 615 F.2d at 374 (holding that the Oklahoma statute at issue created an express trust like the New York Lien law); *First Comm'l Corp. v. First Nat'l Bancorporation, Inc.,* 572 F.Supp. 1430, 1434 (D.Colo.1983) (giving examples of express trusts imposed by state statutes and noting that the New York Lien law was held to create an express trust in favor of subcontractors); *Climax Molybdenum Company v. Specialized Installers, Inc. (In re Specialized Installers, Inc.),* 12 B.R. 546, 551 (Bankr. D.Colo.1981) (noting that the court in *Matter of Kawczynski* held that the New York Lien law created an express trust in favor of subcontractors).

■■■■■ Once it is established that an express trust exists, the question of defalcation must be addressed. The Bankruptcy Code and the legislative history of Section 523(a)(4) do not define defalcation. *Samuels v. Ellenbogen (In re Ellenbogen),* 218 B.R. 709, 711 (Bankr.S.D.N.Y.1998). Although some courts have held that intent is not necessary in committing defalcation,[8] "mere negligence, without some element of intentional wrongdoing, breach of fiduciary duty or other identifiable misconduct, does not constitute 'defalcation' within the meaning of section 523(a)(4)." *In re Ellenbogen,* 218 B.R. at 716 (this Court reached this conclusion after examining *Central Hanover Bank & Trust Co.*

*v. Herbst,* 93 F.2d 510 (2d Cir.1937), analyzing the objective of the Bankruptcy Code which is to provide a fresh start to the "honest debtor," and reviewing ordinary dictionary definitions of defalcation); *In re Zoldan,* 221 B.R. at 88 ("for purposes of Section 523(a)(4), the term 'defalcation' requires at least some element of wrongdoing on the part of the debtor/fiduciary, and that 'innocent' or merely negligent conduct ... is not within the scope of [Section 523(a)(4) ]"); *In re Scheller,* 265 B.R. at 53 (same). However, a defalcation does not necessarily rise to the level of "fraud, embezzlement, or misappropriation." *Id.* (citing *Herbst,* 93 F.2d 510, 512).

Courts are split on the issue whether the owner who hired the defalcating contractor is a beneficiary under Article 3–A and entitled to invoke the benefits of Section 523(a)(4) when he ultimately has to pay the unpaid subcontractors. At least one court has refused to grant the non-discharge relief by expressly holding that an owner is not an intended beneficiary under Article 3–A. *See e.g., Peters v. Griffin (In re Griffin),* 111 B.R. 42, 43–44 (Bankr. W.D.N.Y.1990) (holding that the owner is not a trust beneficiary because the New York Lien law was enacted to protect "contractors, subcontractors, architects, engineers, surveyors, laborer and material men who participate in the improvement as well as specified taxes and expenses"). Some courts simply have stated that a contractor holds the funds in trust for the benefit of certain payees. *See e.g. S & D Maintenance Co., Inc. v. Goldin,* 844 F.2d 962, 969 (2d Cir.1988) ("The [New York] Lien Law declares that funds received by a general contractor in performance of public improvement contracts [or the im-

---

**8.** *E.g., Bombardier Capital, Inc. v. Black (In re Black),* 179 B.R. 509, 514 (Bankr.E.D.Tex. 1995); *In re Gans,* 75 B.R. 474, 490 (Bankr. S.D.N.Y.1987); *In re Iaquinta,* 95 B.R. 576, 580 (Bankr.N.D.Ill.1989); *In re Owens,* 54 B.R. 162, 165 (Bankr.D.S.C.1984); *In re Baker,* 66 B.R. 652, 654 (Bankr.D.Nev.1986); *In re Golden,* 54 B.R. 957, 964 (Bankr.D.Mass. 1985).

provement of real property], and the right to receive those funds, are held by the contractor in trust for the benefit of his subcontractors and suppliers"); *Matter of Kawczynski,* 442 F.Supp. at 415 ("Under the New York Lien law, funds received by general contractors for the improvement of real property must be held in trust for the benefit of the subcontractors and suppliers"); *In re Ketchum,* 409 F.Supp. at 746 ("Once the defendant [the contractor] took affirmative steps to secure funds from [the owner], however, he took on new obligations with respect to [the subcontractor]. He was now a trustee of particular funds which New York law required him to pay to subcontractors"); *In re Schusterman,* 108 B.R. 893, 899 (Bankr.D.Conn.1989) (same); *In re Specialized Installers Inc.,* 12 B.R. 546, 551 ("In *Matter of Kawczynski* ..., the court construed the New York Lien law to create an express trust in favor of subcontractors"); *Universal Maintenance, Inc. v. Amherst Painting, Inc.,* 1995 WL 737927, at *3, 1995 U.S. Dist. LEXIS 18530, at *8 ("Article 3–A of the Lien Law states that funds received by general contractors for the improvement of real property are assets of a trust for the benefit of, *inter alia,* subcontractors and suppliers"); *In re Silba,* 170 B.R. 195, 200 ("The beneficiaries of this statutory trust include subcontractors, architects, engineers, laborers, and material persons"); *In re Grosso,* 9 B.R. 815, 822 ("there may be, and often are, several beneficiaries, e.g., material men, engineers, architects, subcontractors, surveyors, and laborers, under the trust" created by Article 3–A) (footnote omitted).

Some courts have held that an owner is a beneficiary under Article 3–A and similar statutes, and therefore, is entitled to the non-dischargeability relief. For instance, the court in *Weber v. Evans (In re Evans),* 1 B.R. 229 (Bankr.S.D.Fla.1979), held that a New York judgment for four owners of real property against the debtor was non-dischargeable under Section 17a(4) of the Act (predecessor to § 523(a)(4)). The debtor in *In re Evans* was a contractor who agreed to remodel plaintiffs' apartments. Plaintiffs paid the contractor to cover all expenses in a large sum and sued in New York state court when the contractor misappropriated the funds. The New York court found that under Article 3–A (referred to in decision as "Article III–A") a trust was formed with the contractor as a trustee when he received the funds from plaintiffs and the New York court entered judgment for plaintiffs, who had to pay the contractors to avoid liens on their property. Plaintiffs then brought an adversary proceeding to declare their New York judgment non-dischargeable. The Florida bankruptcy court stated that "[a] state court judgment is not *res judicata* on the issue of dischargeability, but it may be estoppel by judgment as to the factual elements essential to dischargeability." The bankruptcy court found that "the New York judgment established each of the elements essential to deny discharge under § 17(a), ... and that the bankrupt is estopped by that judgment from relitigating those facts in this court." *Id.* The court held that Article 3–A created a trust for the "benefit of the proper payees" and a fiduciary relationship within the meaning of Section 17a(4). *Id.* at 230–31 (citing *Matter of Kawczynski,* 442 F.Supp. at 415 and *In re Romero,* 535 F.2d 618). The bankruptcy court expressly rejected the debtor's argument that the plaintiffs were not beneficiaries of the trust under Article 3–A because the statute does not specifically name owners of real property as trust beneficiaries.

The same result was reached by the Tenth Circuit in *In re Romero,* which held that the owners of real property are beneficiaries under the New Mexico lien law,

which was "essentially the same" as Article 3–A.[9] The debtor was a general contractor who contracted to build three four-plexes for plaintiffs, the owners of the real property. Plaintiffs advanced funds to the debtor to pay sub-contractors, materialmen and laborers (the "subcontractors"), but the debtor did not pay the subcontractors, who filed liens against the four-plexes. After trial the bankruptcy court entered judgment against the debtor in favor of plaintiffs and declared the judgment amount non-dischargeable.[10] The Tenth Circuit upheld the bankruptcy court's decision, stating that the debtor "stood in a fiduciary capacity toward" plaintiffs and was under a "duty to assure that money advanced to him was applied in payment for materials and labor relating to the four-plexes." 535 F.2d at 621.

The conclusion that owners should be deemed trust beneficiaries under a state lien statute was also reached in *Stevens v. Harris (In re Harris)*, 49 P.3d 710 (Okla. 2002). There the Supreme Court of Oklahoma, in the context of dischargeability under Section 523(a)(4), construed the Oklahoma construction lien statute [11] which is similar to Article 3–A.[12] The debtor, a general contractor, entered into a construction agreement with plaintiffs, the owners of real property. Plaintiffs paid the first part of the contract price but refused to advance the rest because the construction was never completed. One of the subcontractors filed a lien against plaintiffs' house. The debtor later filed for bankruptcy and plaintiffs brought an adversary proceeding, seeking a declaration of non-dischargeability under Section 523(a)(4). The bankruptcy court certified questions to the Oklahoma Supreme Court, recognizing the important role of the state law in determining the "existence of fiduciary relationship." *Id.* at 713–14. The Oklahoma Supreme Court held that the owners were beneficiaries under the Oklahoma statute because the statute treated "owner monies placed with a contractor as 'trust funds'" and mandated that these funds "shall not be disbursed for any purpose other than for the payment of all lienable claims due and owing until all such claims have been satisfied." *Id.* at 716.

This Court agrees with those jurisdictions holding that owners are beneficiaries under the trusts created by statutes like Article 3–A of the New York Lien Law. If the contractor does not pay his subcontractors, workers and materialmen, ultimately it is the owner who must pay to avoid the subcontractors' liens [13] on his property and

**9.** *In re Evans,* 1 B.R. 229, 231 (citing *In re Romero,* 535 F.2d 618). The Florida court stated that a New Mexico Lien law, which was "essentially the same" as the New York Lien law, was held to create a fiduciary duty on the contractor within the scope of Section 17a(4).

**10.** The bankruptcy court found that the actions of the debtor "constitute the obtaining of money by false pretenses or false representations, fraud, misappropriation and defalcation of trust monies by one acting in a fiduciary capacity and willful and malicious conversion of the property of another." *In re Romero,* 535 F.2d 618, 621.

**11.** Title 42 O.S.2001 §§ 142 and 143.

**12.** *See Carey Lumber Co. v. Bell,* 615 F.2d at 374 (the Fifth Circuit concluded that the Oklahoma lien trust statute created an express trust because it defines trust res and duties of the trustee like Article 3–A of the New York Lien Law).

**13.** A subcontractor who "performs labor or furnishes materials for the improvement of real property with the consent or at the request of the owner's agent or contractor ... shall have a lien for the principal and interest ... upon the real property improved, from the time of the filing of a notice of such lien." New York Lien Law § 3. Under Section 2–3 of the Lien Law the term "owner" includes a lessee for a term of years.

who must, thereby, be the ultimate beneficiary of the statute.

While subsection (4) of Section 523(a) was not pleaded by Sandak, it is appropriate for the Court to grant relief in favor of Sandak where the facts and the law so provide. Although Plaintiff seeks non-dischargeability only under Section 523(a)(2), the Court will *sua sponte* examine non-dischargeability under Section 523(a)(4) without a formal amendment of the complaint because "all of the material facts" necessary for non-dischargeability under subsection (4) have been pleaded in the complaint and proven at trial. *In re Soliz*, 201 B.R. at 370 ("Since all of the material facts which form the basis for non-dischargeability are pleaded in the complaint, an invocation of a different statute than that mentioned in the complaint does not constitute an amendment of the complaint"); *Brandon v. Holt*, 469 U.S. 464, 471, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) ("it is appropriate for [the Court] to . . . decide the legal issues without first insisting that . . . a formal amendment be filed; this is because we regard the record as plainly identifying petitioners' claim for damages on [a different legal theory]"); *Levy v. Alliance Capital Mgmt. L.P.*, 1999 WL 642920, at *2, 1999 U.S.App. LEXIS 20213, at *5 (2d Cir. Aug. 20, 1999) ("courts should look to the facts pleaded rather than to the particular legal theory presented"); *Bowers v. Hardwick*, 478 U.S. 186, 201, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Blackman, J., dissenting, courts are "under a duty to examine the complaint to determine if the allegations provide for relief under any possible theory"); *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 n. 6 (2d Cir.1997) ("However er mistaken the statutory basis . . . of her complaint," plaintiff gave factual allegations that support false pretenses while she was proceeding under a different statutory basis and the court found that this made it clear that her second amended complaint was "sufficient" to state a claim under a different statutory basis); *Underwriters Salvage Co. of New York v. Davis & Shaw Furniture Co.*, 198 F.2d 450, 453 (10th Cir.1952) ("it is duty of the court to consider issues raised by evidence received without objection even though no formal application is made to amend").

The Court's *sua sponte* review under a different statute is consistent with the liberal scheme of Federal Rules of Civil Procedure with respect to pleading requirements.[14] Under Federal Rules of Civil

---

**14.** This liberal attitude towards pleadings can be found in Fed. R. Civ. P. 8, 15(b) & 54(c).

Fed. R. Civ. P. 8(a)(2) provides that a complaint need set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Therefore, a proper complaint in federal courts need not specify under which law it arises. *Ghebreselassie v. Coleman Sec. Serv.*, 829 F.2d 892, 895 (9th Cir.1987); *Bartholet v. Reishauer*, 953 F.2d 1073, 1078 (7th Cir.1992) ("the complaint need not identify a legal theory, and specifying an incorrect theory is not fatal"). A federal court should not ask whether the complaint points to appropriate statute but examine whether a relief is possible under any set of facts consistent with the allegations. *Bartholet v. Reishauer*, 953 F.2d 1073, 1078

(citing *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A dismissal under Fed. R. Civ. P. 12(b)(6) is proper only where " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir.1999) (quoting *Conley v. Gibson, supra*); *Resnik v. Swartz*, 303 F.3d 147, 150–51 (2d Cir.2002) (same); *Hack v. President & Fellows of the Yale College*, 237 F.3d 81, 89 (2d Cir.2000), *cert. denied*, 534 U.S. 888, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001) (the complaint should not be dismissed just because plaintiffs asserted the wrong theory "so long as [they have] alleged facts sufficient to support a meritorious legal claim") (citations omitted); *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (holding that under the

Procedure, "the question is not how plaintiffs characterized the action, but whether plaintiffs are entitled to relief." *Oneida Indian Nation v. County of Oneida*, 434 F.Supp. 527, 547 (N.D.N.Y.1977), *aff'd and rem'd by* 719 F.2d 525 (2d Cir.1983), *aff'd in part and rev'd in part on other grounds by* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). Pleadings do not serve as "ends in themselves, but are simply means by which a case is presented to a tribunal."

*New York State Elec. & Gas Corp. v. Sec'y of Labor,* 88 F.3d 98, 104 (2d Cir.1996).

■ In determining whether the pleadings should conform to the proof, the critical issue is whether prejudice on the part of defendant would result. *Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902, 907 (2d Cir.1977). The Court finds no prejudice to Dobrayel from Sandak's failure to plead this claim under Section 523(a)(4).

liberal pleadings established by FED. R. CIV. P. 8, in ruling on a 12(b)(6) motion "[t]he failure in a complaint to cite a statute, or to cite a correct one, in no way affects the merits of claim" and "[f]actual allegations alone are what matters") (citations omitted); *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir.1991) (where defendant argued that plaintiff cannot get relief under the third party beneficiary theory because he failed to plead it in his complaint, court held that "federal pleading is by statement of claim, not by legal theory"); *Kleinberg v. Radiar Group, Inc.*, 2002 WL 31422884, at *3, 2002 U.S.Dist. LEXIS 20595, at *8 (S.D.N.Y. Oct. 29, 2002) (same) (citing *Strougo v. Bassini*, 282 F.3d 162, 167 (2d Cir.2002)); *McNair v. Jones*, 2002 WL 31082948, at *9, 2002 U.S. Dist. LEXIS 17409, at *32 (S.D.N.Y. Sept. 18, 2002) (same) (citing *Strougo* ); *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992) ("[a] complaint need not point to the appropriate statute or law in order to raise a claim for relief ... [and] a complaint sufficiently raises a claim even if it points to no legal theory or even if it points to the wrong legal theory ... as long as 'relief is possible under any set of facts that could be established consistent with the allegations' ").

The Court is not amending the complaint here. *Pearl Assurance Co. v. First Liberty Nat'l Bank*, 140 F.2d 200, 202 (5th Cir.1944) (amendment of pleadings is not "imperative" where no objection was made as to the scope of the evidence and case was tried as if all issues involved had been raised in pleadings). However, even if the complaint is deemed amended such practice is allowed under FED. R. CIV P. 15(b) and the amendment would relate back to the original complaint. *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 126 (2d Cir.1994) (a claim on a different legal theory would relate back to the original complaint); *Kuba v. Ristow Trucking Co.*, 811

F.2d 1053, 1055 (7th Cir.1987) ("Claims explicitly addressed by the parties and court are treated as added automatically to the pleadings and other necessary documents"). The purpose of FED. R. CIV. P. 15(b) is to "align the pleadings to conform to the issues actually tried." *Gonzales v. United States*, 589 F.2d 465, 469 (9th Cir.1979). Courts should construe FED. R. CIV. P. 15(b) liberally and allow an amendment whenever doing so will effectuate the purpose of the rule. 6 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1491, pp. 453–54. (1971 ed. Supp. 1983).

FED. R. CIV. P. 54(c) also supports the Court's *sua sponte* consideration. Rule 54(c) has been used to grant relief based on a theory of recovery not pleaded in the complaint. *See e.g., Metropolitan Casualty Ins. Co. of New York v. Friedley*, 79 F.Supp. 978 (N.D.Iowa 1948) (insurance policy may be reformed in an action requesting a nonliability declaration); *Garland v. Garland*, 165 F.2d 131, 133–4 (10th Cir.1947) (specific performance may be granted in an action seeking cancellation or rescission). The theory behind Rule 54(c) is that "the dimensions of a lawsuit are measured by what is pleaded and proven, not what is demanded." *Thomas v. Pick Hotels Corp.*, 224 F.2d 664, 666 (10th Cir.1955); *Minyard Enterps., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 386 (4th Cir. 1999) (same). The pleadings "serve only as a rough guide to the nature of the case." *Minyard Enterps., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 386 (quoting *Robinson v. Lorillard Corp.*, 444 F.2d 791, 803 (4th Cir.1971)). "But a party may not be 'entitled' to relief if its conduct of the cause has improperly and substantially prejudiced the other party." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

*See, New York State Elec. & Gas Corp. v. Sec'y of Labor,* 88 F.3d at 104 (a party cannot ordinarily demonstrate that it suffered prejudice simply due to a change in its opponent's legal theory).

With this background, we turn in point II C to each element of damages allegedly sustained by Sandak and the trial evidence bearing upon Sandak's allegations of false pretenses, misrepresentation and fraud on the part of Dobrayel in respect of each element of damage.

### C. Sandak's claims of fraud by Dobrayel and resulting damages

#### 1. HVAC system: $15,500

 When Dobrayel submitted the February 16, 1998 Contract to Sandak, he factored $6,000 into the total contract price of $118,000 specifically for "Ductwork ceiling registers & dampers" without ever having received an estimate from an HVAC subcontractor.[15] In late September of 1998, Dobrayel demanded and Sandak paid $15,500 for "extra work" over and above that contemplated in the Contract because supposedly "the building inspector had imposed on him some changes in the HVAC and had caused him to now need to do a special fire rated HVAC ceiling system . . . because of new rules and regulations related to a Stouffer's fire." (Trial Transcript 143) While Dobrayel based this demand on a $7,500 proposal by the HVAC subcontractor given to him on October 1, 1998, evidence presented at trial shows that this was the first estimate ever re-ceived by Dobrayel for the project and was "for the entire [ductwork] job." In fact, it was not "extra work" over and above the Contract, but rather the exact work specified in the Contract for which Dobrayel had originally allocated $6,000. Despite Dobrayel's representations, there was nothing special about this project and there were no "new" fire rules and regulations that needed to be followed.[16] With respect to this item, this Court finds that (1) Dobrayel made a representation to Sandak that the City of White Plains had imposed an unexpected hardship on him; (2) such representation was false and Dobrayel knew so at the time it was made; (3) Dobrayel made the representation with the intent to deceive Sandak in order to extract an additional payment of $15,500 above the Contract price; (4) Sandak relied on such representation; and (5) Sandak paid and was thereby damaged in the amount of $15,500.

#### 2. Ceiling tiles: $3,365

The testimony of Chris Moran, the general contractor who finished the project, shows that the original plans in the Contract called for one-hour fire-rated ceiling tiles. (Trial Transcript 93–94) Despite the fact that he had already made an allowance in the Contract for the proper ceiling tiles in the amount of $3,500, Dobrayel demanded and Sandak paid an additional $3,365 for "special fire rated ceiling tile" that "were not asked for before and . . . the White Plains Building Department . . .

---

**15.** The foreman of C & M, the HVAC subcontractor, testified that Dobrayel had not contacted C & M until "shortly before 10/1/98," seven and a half months after he submitted his proposal to Sandak that included the $6,000 allowance for the ductwork. (Trial Transcript 68)

**16.** The foreman of C & M, the HVAC subcontractor, testified to these specific points and made it very clear that the project performed at the Premises was very routine and that the municipality did not require any fire-rated items to be supplied by him or Dobrayel. (Trial Transcript 68, 72) Dobrayel offered no evidence to substantiate his claim of "new rules and regulations" or instructions from a "building inspector."

was [now] forcing him to use." (Trial Transcript 148) When asked by Sandak why these tiles were so expensive, Dobrayel claimed they were "a different material that he had never been instructed to use and White Plains was asking him to now." (Trial Transcript 149–50) Testimony by Moran shows that there is negligible difference in cost between generic ceiling tile and fire-rated ceiling tile. Dobrayel's misrepresentation is two-fold with respect to this item, because after his fraudulent demand for extra money for fire-rated ceiling tile, he supplied only generic ceiling tile. (Trial Transcript 94) With respect to this item, this Court finds that (1) Dobrayel made a representation to Sandak that the City of White Plains had unexpectedly required fire-rated tile from him; (2) such representation was false and Dobrayel knew so at the time it was made; (3) Dobrayel made the representation with the intent to deceive Sandak; (4) Sandak relied on such representation; and (5) Sandak paid and was damaged in the amount of $3,365.

### 3. *Electrical fire boxes: $15,600*

Moran testified that a general contractor cannot "bid this job in the City of White Plains ... and omit [electrical] fire rated boxes" from the proposal, and that such items were included in the language of the original proposal. (Trial Transcript 115 and 281) Based on Moran's testimony, which accords with common sense, I find that the cost of supplying and installing such items was provided for in the Contract. Dobrayel falsely represented to Sandak that he had never heard of the need "for electrical fire boxes around all of the light fixtures [and] it was imposed on him by the White Plains Building Depart-

ment and his hands were tied." (Trial Transcript 145) Dobrayel demanded and collected an additional $15,600 from Sandak for these "extra" items that he claimed were "specialized handcrafted devices." (Trial Transcript 148) Once again, Dobrayel's deceit was compounded by the fact that the boxes he actually installed around the light fixtures were merely torn up *non-fire-rated* ceiling tile pieces that were unprofessionally put together with screws and wire, as shown by video evidence and testimony by Moran. (Trial Transcript 284–85) With respect to this item, I find that (1) Dobrayel made a representation to Sandak that he had never heard of such fire-rated fire boxes and the Building Department had unexpectedly imposed the requirement on him; (2) such representation was false and Dobrayel knew so at the time it was made; (3) Dobrayel made the representation with the intent to deceive Sandak; (4) Sandak relied on such representation; and (5) Sandak paid and was damaged in the amount of $15,600.

### 4. *Electric lighting: $12,545*

The Contract had an allowance for lighting in the amount of $4,800, which covered fourteen high hat lights and seventeen fluorescent lights. With Dobrayel's permission, Sandak supplied these fixtures in an effort to save money. Sandak paid $2,090 to an electrical supply store and was expecting a credit for the amount of the lighting allowance in the Contract. Instead of giving the credit to Sandak, Dobrayel falsely represented that more lighting was needed and demanded an additional $5,745 which he claimed was "his cost and [that he] was doing this ... as a favor."[17] (Trial Transcript 149) No extra lighting was ever provided until a later

---

**17.** It appears that Dobrayel's so-called "favor" to Sandak regarding this item was that he was not making a profit for himself on this

item. He falsely represented to Sandak that $5,745 was the contractor cost for lighting that was never delivered or installed.

time when Dobrayel demanded an additional $6,800 for electrical lights. Dobrayel explained to Sandak that the existence of structural beams in the building would preclude the use of certain lighting supplies and after an agreement between the two, thirty-four additional high hats were supposed to take the place of those lights. (Trial Transcript 324) Dobrayel falsely represented to Sandak that the extra lights would cost $6,800 and Sandak paid this sum. (Trial Transcript 158) Testimony by Moran showed that the only fixtures on the Premises long after Dobrayel had abandoned the project were thirty-four high hats and eleven fluorescent lights *in total*, while the Contract originally allowed for fourteen high hats and seventeen fluorescent lights. (Trial Transcript 114–15) This proves that not thirty-four but twenty high hats were later provided by Dobrayel and six fluorescent lights were retained by him. Moran's testimony shows that the extra twenty high hats, which would have cost a total of $1,000, are "at the very least equal to" the cost of the six fluorescent lights which Dobrayel retained. (Trial Transcript 113–15) The additional lighting for which Dobrayel demanded extra compensation totaling $12,545 did not impose any greater costs than that already allowed for in the Contract. With respect to this item, this Court finds that (1) Dobrayel made representations to Sandak that additional lighting fixtures were needed and they would cost $12,545; (2) such representations were false and Dobrayel knew so at the time they were made; (3) Dobrayel made the representations with the intent to deceive Sandak; (4) Sandak relied on such representation; and (5) Sandak paid and was damaged in the amount of $12,545.

### 5. Additional charge for Pergo flooring: $6,100

Dobrayel's contract provided a $3,000 allowance for floor tiles. At some point after the Contract was entered into, Sandak elected Pergo laminate flooring. Dobrayel represented to Sandak that Pergo flooring was far more costly to purchase and to install, and he charged Sandak $6,100 more than the $3,000 Contract allowance, which Sandak paid. When Moran took over the project in the fall of 1999, 60% of the Pergo tiles were installed and some additional tiles were in boxes on the site, but Moran had to purchase a substantial portion of additional tiles to complete the job. It was Moran's testimony, unrebutted by Dobrayel at the trial, that all of the Pergo tiles including the additional tiles that Moran was required to purchase, could have been purchased and installed within the original $3,000 Contract budget. I conclude that (1) Dobrayel misrepresented to Sandak that an additional $6,100 cost was required to buy and install Pergo tiles; (2) such representation was false and known by Dobrayel to be false when made; (3) Dobrayel made the representation with the intent to deceive Sandak; (4) Sandak relied on such representations; and (5) Sandak paid and was damaged in the amount of $6,100.

### 6. Defalcation of subcontractor trust funds: $13,060

Although he received full payment of $118,000 under the Contract, as well as over $58,000 of additional payments induced by fraud, Dobrayel failed to pay three of his subcontractors for work performed on the project—Lombardo Heating and Plumbing $4,800 (Trial Tr. at 47, Ex. 16), Fail Safe Electrical $6,760 (Trial Tr. at 163), and C & M Air Systems $1,500 (*id.*). The payments received by Dobrayel from Sandak which Dobrayel owed to these subcontractors constituted trust funds under the New York Lien Law as discussed under point II B, above. In the fall of 1998,

when he was demanding additional payments from Sandak, Dobrayel falsely represented to Sandak that he had paid all the subcontractors (*id.* at 163). His failure to pay over trust funds to the three subcontractors constituted defalcation while acting in a fiduciary capacity within the scope of Section 523(a)(4).

Accordingly, I find as a matter of fact and law that Sandak is entitled to a judgment of liability and non-dischargeability against Dobrayel in the amount of $13,060 in respect of Dobrayel's defalcation of subcontractor trust funds, which Sandak became obligated to, and did, pay.

### 7. *Cost for Moran to complete the job: $35,000*

■ Since Sandak paid Dobrayel the full Contract amount to complete the project, plus very substantial additional sums, and Dobrayel without excuse failed to complete the job, Sandak is entitled to judgment for the $35,000 which he paid Moran to complete the project as damages for Dobrayel's breach of contract. However, nothing in the Bankruptcy Code provides for non-dischargeability of a debt for breach of contract. Nor is there any causal connection between Dobrayel's fraud, deceit and false pretenses which began in September 1998 and the cost to complete the project after Dobrayel quit. This is evident from the fact that, had Dobrayel abandoned the project for any reason in August 1998, prior to any of his conduct which this Court has found to be deceitful, Sandak's breach of contract damage claim of $35,000 to complete the project would have been precisely the same.

Accordingly, Dobrayel's liability of $35,000 for breach of contract will be discharged.

### 8. *Dental equipment lease/storage: $12,956*

■ Sandak scheduled commencement of his lease of dental equipment from the manufacturer for January 1, 1999. It is not clear from the trial record when Sandak made ⸴ this arrangement with the equipment manufacturer. But it appears he did so at least as early as August 1998, because he knew before August that the construction project was delayed and would not be complete by September, although he was confident that it would be by the end of the year. As a result of Dobrayel's breach of contract in failing to complete the job, Sandak was forced to pay the $12,956 lease cost for the privilege of storing the equipment in the manufacturer's warehouse for the full year of 1999, until Moran finally completed the project.

The foregoing facts might warrant a judgment for $12,956 for breach of contract, on the theory that Sandak had to incur this cost while the dental equipment lay fallow and unproductive in storage due to Dobrayel's failure to complete the construction project by the end of the year 1998. The Court need not and does not reach this question, however, because it is a moot point. No causal connection was established in the evidence at trial showing that the 1999 dental equipment lease/storage costs were incurred as a consequence of any fraudulent or deceitful conduct by Dobrayel, which began in mid-September 1998. Sandak was not induced to lease the dental equipment by any conduct lawful or unlawful of Dobrayel—he needed the equipment to practice dentistry. There was no evidence at trial as to the date when Sandak made the arrangement with the equipment manufacturer to commence leasing the equipment in January 1999, and Sandak did not testify that he was induced by Dobrayel to begin the leasehold at that time or at any particular time.

Sandak's claim, if he has one, in respect of the 1999 lease costs for the dental equipment would be based solely on breach of contract, and that claim is discharged.

### 9. *Lost income for 1999: $125,000*

▇ Sandak earned $386,790 and $404,230 during 1998 and 1999, the first two years of his practice, which was conducted from the nearby office of his father, a long-time practicing dentist. His gross income for the year 2000, his first year in his own office, was $529,631. Sandak claims that he was damaged by Dobrayel's failure to complete construction of his new dental office during 1998 in the amount of $125,631, purportedly representing the difference between what he actually earned in 1999 and what he would have earned in that year had he been able to conduct his practice from his own, newly-constructed office.

The defect in Sandak's claim for lost income for 1999 is that the claim is speculative. It is to be expected in the normal course of events that a fledgling dental practice, like any other beginning economic endeavor, will increase in economic productivity during the early years of the venture. Sandak was fortunate that his first two years, 1998 and 1999, were highly successful notwithstanding that he was practicing from his father's office. The third year, 2000, was substantially better, as one might expect even if there had been no change in the location of his practice from the second to the third year. Intuitively, it may be supposed that the first year in Sandak's own office would result in some increment in his income and, therefore, that Sandak did sustain some quantum of economic harm as a consequence of Dobrayel's deceit and breach of contract. But there undoubtedly were many factors that contributed to the increment in Sandak's earnings from 1999 to 2000 that had

nothing to do with the change in office from his father's to his own. Moreover, it may also be true that Sandak benefitted from conducting his practice in its early stages from his father's office.

Lacking any reliable basis to quantify the economic harm, if any, resulting from Dobrayel's deceit and breach of contract, I will not impose liability on this debtor based on my own or the plaintiff's speculation.

Even if Sandak's claim for loss of earnings were not speculative, it would be discharged as a debt for breach of contract. The alleged diminution in earnings during 1999 resulted not from any fraud or false pretenses within the purview of Section 523(a)(2), but from Dobrayel's failure to perform his Contract.

### 10. *Sandak's other damage claims*

The Court has carefully considered Sandak's other claims in this case and concluded that they do not merit relief, either as to liability or as to non-dischargeability.

### *Conclusion*

Sandak is entitled to a judgment as to both liability and non-dischargeability in respect of his claims discussed above under point II C 1, 2, 3, 4, 5 and 6, aggregating $66,170. While Sandak has established a valid claim for damages for breach of contract with respect to item 7 and an arguable claim for damages for breach of contract with respect to item 8, no grounds were proven at trial to establish non-dischargeability under Section 523(a) with respect to either. Accordingly, Sandak's claims under items 7 and 8 are discharged.

Finally, Sandak's claims discussed under items 9 and 10 have not been established either as to liability or non-dischargeability and are therefore denied.

Counsel for Sandak will prepare an appropriate order/judgment consistent with this decision.