**In re Richard Robert HAMBLEY and Renee Marie Smith–Hambley, Debtors.**

**Theodosios Voyatzoglou and TE 2000, Inc., Plaintiffs,**

**v.**

**Richard Robert Hambley and Renee Marie Smith–Hambley, Defendants.**

**Bankruptcy No. 8–99–85575–mlc. Adversary No. 8–99–8483–dem.**

United States Bankruptcy Court, E.D. New York.

Aug. 23, 2005.

Sanford P. Rosen & Associates, New York City, By Sanford Rosen, Esq., for the Plaintiffs.

Renee Marie Smith, Esq., Miami, FL, Pro Se Defendant.

Richard Robert Hambley, Fort Lauderdale, FL, Pro Se Defendant.

## DECISION AND ORDER
## AFTER TRIAL

DENNIS E. MILTON, Bankruptcy Judge.

The plaintiff Theodosios Voyatzoglou is an individual and the plaintiff TE 2000 Inc. ("TE 2000") is a Florida corporation with its principal place of business in Broward County, Florida. In 1997 and 1998, the defendants Richard Robert Hambley ("Hambley") and Renee Marie Smith ("Smith")[1] owned all of the equity of Millennium IT (Thailand) Ltd. ("Millennium"). Voyatzoglou formed TE 2000 for the purpose of holding the shares of Millennium which he had agreed to purchase from the defendants. On May 14, 1998, Voyatzoglou and the defendants entered into a "Heads of Agreement" pursuant to which the defendants agreed to sell to Voyatzoglou fifty per cent of the equity of Millennium for $300,000. Voyatzoglou made installment payments to the defendants on May 15, 1998 and June 2, 1998, in the amounts of $50,000 and $125,000, respec-

---

1. The defendants were married when they filed their petition. Following their divorce, Renee Smith-Hambley resumed the use of the name of Renee Smith.

tively. Subsequently, a dispute arose between Voyatzoglou and the defendants, and Voyatzoglou failed to make any additional payment for the shares of Millennium.

On July 13, 1999, the defendants Hambley and Smith filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. The plaintiffs timely filed their proof of claim. The plaintiffs listed the basis for the claim as conversion, fraud, breach of contract, RICO violations, and civil theft.[2] The defendants did not object to the proof of claim.

On November 3, 1999, the plaintiffs commenced this adversary proceeding by filing the Complaint. The Complaint contained five causes of action, which plaintiffs denominated as Claims for Relief. On July 19–20, 2004, the Court held a trial on the issue of the dischargeability of the claim. On February 28, 2005, the plaintiffs filed their Proposed Findings of Fact and Conclusions of Law. On March 25, 2005, Hambley filed a letter in lieu of a post-trial submission. On April 5, 2005, the plaintiffs submitted a reply to Hambley's letter. The Court then reserved decision.

As set forth more fully below, the Court holds that the defendants are not barred from contesting the allegations of the Complaint in this adversary proceeding as a result of their actions in defaulting in the State Court Action (First Claim For Relief). The Court finds that the plaintiffs have met their burden of proof with regard to their claim and the Court fixes the amount of this claim in the amount of the proof of claim, $ 700,000.00 plus interest costs and attorneys fees (Second Claim For Relief). The Court further finds that this debt is non dischargeable under Bankruptcy Code Sections 523(a)(2)(Third Claim For Relief), 523(a)(4)(Fourth Claim For Relief) and 523(a)(6)(Fifth Claim For Relief).

*JURISDICTION*

This Court has subject matter jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2) and the Eastern District of New York standing Order of reference dated August 28, 1986. This decision constitutes the Court's findings of facts and conclusions of law to the extent Fed. R. Bank. P. 7052 requires.

*FINDINGS OF FACT*

The Court makes the following findings of fact. In 1997, the defendants owned all of the equity in Millennium. Compl.¶ 7, Answer ¶ 1. The defendants sought outside investors in the company, which was based in Thailand. Voyatzoglou, Tr. I at 5, lines 11–22;[3] Millennium Solicitation Letter, Ex. 1. The defendants claimed Millennium was in the business of distributing computer software designed to address the year 2000 Millennium Bug.[4] Solicitation Letter,

---

2. Previously, on October 8, 1998, the plaintiffs commenced an action against the defendants in the Circuit Court of the 17th Judicial District for Broward County, Florida (the "State Court Action"). The complaint in the State Court Action contained causes of action for conversion, fraud, breach of contract, breach of fiduciary duty, negligence, conspiracy, and violations of Florida's Racketeer Influenced and Corrupt Organization Act. The State Court Action sought a judgment against the defendants in the amount of $700,000, and interest, costs, and attorneys' fees. The plaintiffs attached the Complaint in the State

Court Action, the proposed amendment to the State Court Complaint, and the Heads of Agreement to the proof of claim.

3. References preceded by the prefix "Tr. I" refer to the transcript of trial proceedings on July 19, 2004. References preceded by the prefix "Tr. II" refer to the transcript of trial proceedings on July 20, 2004.

4. The Year 2000 Millennium Bug purportedly would affect the world's computers on January 1, 2000. The computer code had been designed several decades before and would

Pl.Ex.1. By January 1998, the need for investors became acute as the company's financial situation worsened. Smith, Tr. I at 146–147.

In early 1998, a mutual friend, Alex Villalon ("Villalon"), introduced Voyatzoglou to the defendants. Tr. I at 5; Smith Tr. I at 147, lines 23. Villalon knew the defendants were seeking investors and that Voyatzoglou was also in the computer software business. Voyatzoglou, Tr. I at 5, lines 13–20; Smith Tr. I at 147–148.

### A. The Defendants Falsely Told Voyatzoglou That Millennium Had Exclusive Rights in Thailand to the ConSyGen Y2K Program.

The defendants had prepared a solicitation letter for the purpose of soliciting new investors and marketing Millennium (the "Solicitation Letter"). Smith, Tr. I at 53, lines 11–14, 17–18. In the Solicitation Letter, the defendants claimed that Millennium was a distributor of ConSyGen 2000 Y2K Bug Software (the "Y2K Program"). *See* Pl.Ex. 1. The Solicitation Letter alleged that this program was the only automated program which could fix the Millennium Bug, and that it could do so faster and with fewer errors than hand correction. *Id.* The defendants also alleged that they had exclusive rights to distribute the Y2K program in Thailand, as well as exclusive rights to other computer programs:

> We [the defendants] are holding exclusive rights for Thailand, to the only technology existing that can perform mainframe conversions through a fully automated process . . . .
>
> We have . . . [s]igned all of the contract and agreements that grant us exclusive rights to ConSyGen 2000 Y2K solution in Thailand.

Pl.Ex. 1. Voyatzoglou testified that Villalon gave him the Solicitation Letter in or around March 1998. Tr. I at 11–12. Voyatzoglou also testified the defendants told him that they had exclusive rights to the Y2K Program when he first spoke to them in March 1998 and that they were aware he had seen the Solicitation Letter. *Id.* at 8, lines 4–9, at 12, lines 4–9 and at 102, lines 10–15.[5]

However, the defendants did not have exclusive rights to the Y2K Program in Thailand. *Id.* at 145–46. Smith testified that the defendants had entered into a teaming agreement with ConSyGen which they believed granted them exclusive rights to the Y2K Program in Thailand. *Id.* at 146. Smith stated that the defendants learned in January 1998 that they were mistaken when ConSyGen cancelled the original teaming agreement and entered into a new one with the defendants.[6]

read any year entered based on the last two digits of the previous century. For example, "00" would be read as the year 1900, not 2000. Many believed this could cause problems if not addressed. Solicitation Letter, Ex.1; Voyatzoglou's testimony, Tr. I at 6, lines 2–11.

5. Smith testified that the defendants did not forward the Solicitation Letter to Voyatzoglou, did not give it to Villalon, did not use the Solicitation Letter after January 1998, and did not know how Voyatzoglou had received a copy of it. Tr. II at 53–54. The Court finds Smith's version of events to be less than credible. The Court finds that Villalon gave Voyatzoglou the Solicitation Letter and introduced the parties to each other for purpose of a proposed investment by the plaintiffs in Millennium.

6. The defendants claimed in the Solicitation Letter that they had spent $250,000 for the exclusive rights to the Y2K Program. Pl.Ex. 1. Smith testified that the defendants had actually signed a promissory note for $250,000, but that the promissory note was destroyed when ConSyGen cancelled the original teaming agreement. Tr. II at 52, lines 3–18. She further testified the defendants did not inform Voyatzoglou that the $250,000 note was destroyed and that the defendants

*Ibid.* Examination of the second teaming agreement between ConSyGen and the defendants revealed a date of April 2, 1998, three months after Smith claimed the original one had been cancelled and the new one issued. *See* Conversion Services Teaming Agreement between ConSyGen and Millennium, Pl.Ex. 2. The new teaming agreement unequivocally stated that the agreement was nonexclusive: "[Millennium] may offer [ConSyGen]'s services to [Millennium]'s Clients requiring such services.... The relationship between [Millennium] and [ConSyGen] shall be nonexclusive." Pl.Ex. 2 at 1, ¶¶ 1, 4.

In April 1998, the sale price for the purchase of fifty per cent of the stock in Millennium was $250,000. Smith, Tr. I at 153, lines 10–25. Tr. I at 18, lines 2–16. In December 1997, the Solicitation Letter had claimed the defendants had incurred $150,000 in expenditures, in addition to the $250,000 for the "exclusive" rights to the Y2K Program. Voyatzoglou testified that the defendants informed him that they had invested almost $250,000 in Millennium by April 1998. He testified that he agreed to invest an amount equal to the amount of the defendants' investment in exchange for fifty per cent of Millennium's stock, and an extra $50,000 to capitalize the business and move Millennium's headquarters into better office space. Tr. I at 18, lines 9–16, at 24–26. *See also* Heads of Agreement, Compl., Ex. A. Voyatzoglou testified that he was unaware that Millennium's rights to the Y2K Program were nonexclusive until the discovery phase of this adversary proceeding. Tr. I at 13, lines 10–17.

The Court finds that the defendants falsely informed Voyatzoglou, both in writing and orally, that Millennium had exclusive rights to the Y2K Program, and that they falsely stated in writing that they had invested $250,000 for that exclusive right, when they knew that they were no longer liable to ConSyGen on the promissory note.

B. The Defendants Falsely Told Plaintiffs That Millennium Had Signed Contracts.

The Solicitation Letter also alleged that Millennium had numerous customers. It provided in pertinent part that "[e]very one of [60 mainframe users in Bangkok] [Thailand] will be coming to us" for the Y2K program. Pl.Ex. 1. In addition, the defendants claimed that manufacturers of mainframes were "recommending us [the defendants] to perform the Y2K conversions on their equipment...." *Id.* Voyatzoglou testified before they signed the Heads of Agreement on May 14, 1998, the defendants had informed him that Millennium had many large clients for the Y2K Program including IBM Thailand, Sun Microsystems, Digital, Hewlett Packard, Tandem as well as telecommunication companies, financial institutions, and Thai government agencies. Tr. I at 21–23. Voyatzoglou later learned that none of these entities was a customer of Millennium and that some were direct competitors. *Id.* at 23, lines 7–9.

Smith testified the defendants had informed Voyatzoglou that they had no signed customers. *Id.* at 149, lines 21–24. Smith's testimony is contradicted by an e-mail from Hambley to Voyatzoglou dated March 25, 1998 which read: "[o]ur clients include: IBM Thailand, Sun Microsystems, Digital, Hewlett Packard ... Financial Institutions and the government agencies." Pl.Ex. 5. On May 13, 1998, the same date Voyatzoglou signed the Heads of Agreement, the defendants sent another e-mail which stated, "Siam Motors (Nissan) has delivered us 2.8 millions LOC [line of

were no longer liable on it. Tr. II at lines 19–23.

credit] with a thoroughly completed questionnaire. ConSyGen is committed to the project." Pl.Ex. 22. This e-mail was sent on Smith's e-mail account and signed by Hambley. Smith, Tr. II at 22, lines 6–10. On cross-examination, Smith admitted that Siam Motors was not a customer, and that the defendants were attempting to solicit business from them at that time. *Id.* at 23–24. Smith admitted no contracts had been signed with any customers before they entered into the Heads of Agreement. *Id.* at 26–27.

The Court finds that the defendants falsely claimed in both written and oral statements made before the parties entered into the Heads of Agreement that Millennium had customers committed to using the Y2K program.

### C. The Defendants Violated the Heads of Agreement.

Hambley sent Voyatzoglou a Letter of Intent, prepared by Smith, and dated May 12, 1998, outlining his understanding of the terms of their agreement. Pl.Ex. 8. The Letter of Intent stated the purchase price of the stock was $300,000, with $50,000 allocated to finance the move of Millennium into new offices, and $250,000 for the company purchase. The Letter of Intent also provided that "Contracts outlining specifics of the partnership will be negotiated and signed by the end of the month [May 1998]." *Id.* In response to the Letter of Intent, which he believed was inaccurate, Voyatzoglou drew up the Heads of Agreement. Voyatzoglou, Tr. I at 33. Though dated May 5, 1998, it was not fully executed until May 14, 1998. Pl.Ex. 9. The Heads of Agreement outlined the basic terms for the sale of stock and subsequent partnership and was intended to be subject to a final contract. Voyatzoglou testified that he considered the Heads of Agreement preliminary, and expected that the parties would enter into a final contract providing for final terms of the stock transfer, employment agreements, and by-laws. Tr. I. at 36, lines 23–25.

The Heads of Agreement required a final contract for the transfer of the shares of Millennium stock to the plaintiffs[7], the execution of employment contracts before the defendants could draw salary[8], and the return of Voyatzoglou's investment if the parties did not enter into a final contract.[9]

After the parties signed the Heads of Agreement, they failed to enter into a final contract. Tr. I at 36, lines 23–25, 37. There is strong evidence that the defendants knew a final contract was needed. Tr. I at 155–56. The defendants prepared a final contract for the purchase and sale of the corporate stock of Millennium for the plaintiffs, which was effective by its terms on July 15, 1998. Pl.Ex. 23. Smith admitted that, although the defendants executed the contract, the plaintiffs had not signed a final contract. Smith, Tr. II, at 47–49; Pl.Ex. 23. Despite this acknowledgment, Smith testified that in her mind, the negotiations were just "fine tuning," Tr. I at 156–57, and that "it was my understanding we [the defendants] were allowed to take salaries" without a final contract. Tr. I at 154, lines 14–16.

Smith also testified to a growing concern that employment contracts had not been finalized after the Heads of Agreement was signed. "I submitted to him the employment contracts the beginning of May ... either May 5 or May 13. I received the contract with the new date of July 15 on it ... This concerned me because I

---

7. Pl.Ex. 9, clause 11.

8. Pl.Ex. 9, clause 5.

9. Pl.Ex. 9, clause 11.

knew we had already been taking salaries because personally we were out of money." Tr. I at 156, lines 11–22. On May 28 and 31, 1998, Smith and Hambley sent e-mails to Voyatzoglou, acknowledging that the parties were still making changes to the proposed final contracts, and that their attorney was still reviewing them. Pl.Ex. 10, 11. As late as July 18, 1998, the proposed final contract had not been signed, and the details of the employment contracts were being finalized. E-mail from defendants to Voyatzoglou, Pl.Ex. 13. Despite their contention that the Heads of Agreement contained the parties' final intent, the conduct of the defendants as reflected by their e-mail activity and in Smith's testimony established their knowledge that a final contract was needed for the sale of stock, that they were not entitled to take salaries until that sale, and that Voyatzoglou was entitled to the return of his investment if a final agreement was not executed.

The defendants used the $175,000 in capital from Voyatzoglou for business and personal expenses. Smith, Tr. I at 146, lines 18–22, at 156, lines 11–22. Despite the failure to enter into a final agreement, the defendants acknowledged drawing "salaries" from Millennium of at least $30,000 each between January 1998 and August 1998. Defendants' 1998 joint tax returns, Pl. Ex 4. Disregarding the requirement for employment contracts and a final contract of sale, the defendants executed Employment Agreements with Millennium dated July 15, 1998, calling for salaries of $75,000 from July 15, 1998 through December 31, 1998, as well as reimbursement of expenses. Pl.Ex. 21. Hambley signed Smith's contract as a director of Millennium, and attested as a witness. Smith did the same for Hambley.

The Heads of Agreement further provided that if the parties failed to enter into a final contract, the defendants were required to return the investment to Voyatzoglou. On August 6, 1998, Voyatzoglou requested the return of his investment. Smith, Tr. I at 162, lines 3–5, 10–11. Despite this request, Smith testified that "it wasn't possible to give him all the money back out of the company and keep the company operating" and that it would require a "new investor in order to get his money back." Tr. I at 162, lines 8–14. Smith acknowledged that the defendants could not fulfill the term of the Heads of Agreement requiring the defendants to return Voyatzoglou's investment if a final contract could not be executed. Voyatzoglou's undisputed testimony was that by August 1998, only $30,000 remained of the $175,000 he had forwarded to the defendants and they could not explain where the money had gone. Tr. I at 52–53.

D. The Defendants Induced Voyatzoglou to Make Payments Into the Defendants' Personal Accounts and Improperly Used the Money for Personal Expenses

On May 10, 1998, after the defendants told him new offices were needed immediately, Voyatzoglou informed them that he would transfer $50,000 into Millennium's Business Account as soon as the Heads of Agreement was executed. Pl.Ex. 7; Tr. I at 155–157. Smith suggested to Voyatzoglou that he should transfer the funds to the defendants' personal account so that the funds could remain in United States dollars, and avoid the Thai Baht fluctuations which would occur if he deposited the funds into Millennium's account at Standard Charter Bank in Thailand (the "Millennium Account"). Pl.Ex. 7. Voyatzoglou transferred the money to the defendant's personal bank account in Thailand because of this advice. Tr. I at 43–45. He believed the defendants would be the custodians of the funds, but the funds would be

considered Millennium capital, and transferred to the Millennium Account to pay expenses. Tr. I at 30.

Smith testified at her deposition on May 24, 2000, before the bank records for the Millennium Account became available, that the defendants moved all of the capital Voyatzoglou provided from the defendant's personal account through the Millennium Account to pay expenses and that the bank records would demonstrate this. Smith Deposition, Tr. at 51. The records for the Millennium Account showed otherwise. The records showed that a substantial amount of the money remained solely in the defendants' personal account. Pl.Ex. 17, 18. At trial, Smith testified that her deposition testimony had been incorrect and that much of the money had not been transferred to the Millennium Account. Tr. I at 182, lines 20–24, at 184–85. According to Voyatzoglou, the defendants' transferred only $74,790 of the $175,000 from the personal account to the Millennium Account. Tr. I at 69–74. The Court's review of the bank records revealed several transfers of $5,000 each from the Millennium Account to what appears to be Hambley's personal account in Florida. *See* Pl.Ex. 18, at 12, 14, 19, 23, 25, and 30. The records also demonstrated that there were numerous cash withdrawals for which the defendants failed to provide receipts. Voyatzoglou testified that, based on his review of the records, approximately $99,719.72 appeared to be used for the defendant's personal use and $74,900 was transferred to the Millennium Account, accounting for $174,509.73 of the $175,000 he provided. Tr. I at 79–81, Pl.Ex. 19. While Smith disagreed with the exchange rate he used, she did not contest the underlying contention that tens of thousands of dollars remained in the defendants' personal account. Tr. II at 66, lines 8–21. Smith admitted defendants used the monies in part to pay personal expenses and

some bills in the United States. Tr. I at 181, lines 1–3, at 183. The Court finds that the defendants induced plaintiffs to deposit his investment in Millennium into their personal account and then used much of those funds for their unexplained personal expenses.

## ANALYSIS

### I. The Defendants Are Not Collaterally Estopped From Contesting This Complaint.

■ In the First Claim For Relief, the plaintiffs seek a determination that the defendants are collaterally estopped from contesting the allegations set forth in the Complaint in this proceeding as a result of their defaults in State Court Action. In order to establish the bar of collateral estoppel, the plaintiffs must establish the following four elements: (1) the issue previously decided is identical with the one presented in the action in question; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *Schulz v. Williams*, 44 F.3d 48, 53–54 (2d Cir.1994); *Dear v. Board of Elections in City of New York*, 2003 WL 22077679, *7–8 (E.D.N.Y.2003).

The defendants admitted in their Answer that they did not answer the allegations contained in counts I through IX and paragraphs 36 through 105 of the complaint in the State Court Action. Answer, ¶ 11. The defendants did not admit the allegation in the Complaint that the defendants failed to appear for the state court hearing on July 14, 1999 in which the plaintiffs moved to strike their answer to the complaint in the State Court Action.

The Complaint alleged that the State Court granted the plaintiffs' motion and directed counsel to submit a proposed order. However, the defendants denied this. In this case, the plaintiffs did not present any evidence, such as a transcript of the hearing, which demonstrated that the state court had granted their motion to strike the defendant's answer. The state court hearing on the motion to strike occurred after the bankruptcy was filed and the automatic stay of Section 362 was in place. Finally, plaintiffs admit the state court judge did not sign an order granting the relief of striking the state court answer, much less a default judgment. Therefore, the Court holds that there was no adjudication on the merits in the State Court Action, and defendants are not collaterally estopped from defending the Complaint.

II. The Plaintiffs' Proof of claim is Valid and Dischargeable Unless It Falls Within An Exception to Discharge.

■ In the Second Claim For Relief, the plaintiffs alternatively seek an Order fixing the claim in the full claim amount. Compl, ¶ 34. Under Section 502 of the bankruptcy code, "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502. The defendants did not object and therefore the proof of claim is deemed allowed. *In re G. Marine Diesel Corp.* 155 B.R. 851, 853 (Bankr.E.D.N.Y.1993); *In re Greene,* 71 B.R. 104, 106 (Bankr.S.D.N.Y.1987)(allowance of properly filed proof of claim "compels the objecting party to go forward and produce sufficient evidence to rebut the claimant's *prima facie* case"). The supporting documentation attached to the proof of claim, including the State Court Complaint and the Heads of Agreement were sufficient to demonstrate the *prima facie* validity of the claim.

The defendants also admitted the claim was valid. In the Complaint, the plaintiffs alleged they were creditors of the defendant by virtue of the timely filed proof of claim. Compl., ¶ 6. The defendants admitted the allegations that plaintiffs are creditors of theirs and timely filed a proof of claim. Answer, ¶ 1. Therefore, the defendants, having failed to file a motion objecting to the claim of the plaintiffs and having admitted that the claim was timely filed and the plaintiffs are creditors of the estate have not rebutted the presumption of validity. The claim is valid in the full claim amount of $700,000 plus interest, costs and attorneys' fees.

The defendants received a discharge under Bankruptcy Code Section 727. A discharge under Section 727 of the Bankruptcy Code relieves a debtor from all prepetition liabilities, subject to a few exceptions. 11 U.S.C. § 727; *In re Dobrayel,* 287 B.R. 3, 11–12 (Bankr.S.D.N.Y.2002). The claim would therefore be discharged, unless the claim is excepted from discharge under Section 523 of the Bankruptcy Code.

III. The Claim is Excepted From Discharge Under Code Section 523(a)(2)(A)

■ In the Third Claim For Relief, the plaintiffs allege that the claim consists of debts for money which the defendants obtained through false pretenses, false representations, or actual fraud and the claim is excepted from discharge pursuant to Section 523(a)(2) of the Bankruptcy Code.[10]

10. Section 523(a)(2)(A) of the Bankruptcy Code provides a debtor is not discharged from any debt for money, property, or services obtained through three methods. The first method is debt for money, property, or services obtained through false pretenses.

Compl. ¶¶ 36–37. The terms "false pretenses," "false representations," and "actual fraud" are similar in meaning, but the use of the subjunctive "or" demonstrates they embody somewhat different concepts. *See Dobrayel,* 287 B.R. at 12; *Farraj v. Soliz,* 201 B.R. 363, 369 (Bankr.S.D.N.Y. 1996). The plaintiffs have the burden of demonstrating nondischargeability under this section by a preponderance of the evidence. *Id.*

A. The Defendants Obtained Money Through False Pretenses. The Claim is Nondischargeable Under Code Section 523(a)(2)(A).

 Under Code Section 523(a)(2)(A), the term "false pretenses" is defined as "conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property." *Kovler,* 249 B.R. at 261. It is the practice of any "scam, scheme, subterfuge, artifice, deceit, or chicanery in the accomplishment of an unlawful objective" on behalf of the defendant. *Id.* A false pretense has also been held to be an implied misrepresentation or conduct intended to create a false impression. *In re Bozzano,* 173 B.R. 990, 993 (Bankr. M.D.N.C.1994). A false pretense is promoted willingly and knowingly by a defendant and is not the result of unintentional conduct or an unintentional misrepresentation. *Kovler,* 249 B.R. at 261. Failure to disclose material facts on which a transaction depends constitutes false pretenses within the statute. *In re Soliz,* 201 B.R. 363, 369 (Bankr.S.D.N.Y.1996).

 In order to establish a debt is non dischargeable as a debt for money obtained by false pretenses, the plaintiffs must establish (1) an implied misrepresentation or conduct by the defendants; (2)

promoted knowingly and willingly by the defendants; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs to advance money, property, or credit to the defendant. *Dobrayel,* 287 B.R. at 12. The plaintiffs have demonstrated by a preponderance of the evidence that the defendants obtained the monies which constitute the debt owed to the plaintiffs through false pretenses, by knowingly inducing a false and misleading impression on the plaintiffs' behalf which wrongful induced Voyatzoglou to turn over funds. The defendants knowingly created the false and misleading impression by misrepresenting that (1) they had exclusive rights to the Y2K Program; (2) they had numerous customers already signed up; (3) they had expended $250,000 in expenditures which would be demonstrated through financial records, which they did not provide; and (4) all of the funds invested would be used as capital through the Millennium Account. These misrepresentations caused the plaintiffs to transfer the money into the defendants' personal accounts. The debt to which the claim refers to was a debt created through false pretenses, and is nondischargeable under Section 523(a)(2)(A).

B. The Defendants Obtained Money Through False Representations. The Claim is Nondischargeable Under Code Section 523(a)(2)(A).

 A Court can find a false representation if the plaintiffs present proof by a preponderance of the evidence that the defendants (1) made a false or misleading statement; (2) with the intent to deceive; and (3) in order for the plaintiffs to turn

---

The second is debt for money or property, or services obtained through false representations. The third is debt for money, property, or services obtained through actual fraud. 11 U.S.C. § 523(a)(2)(A).

over money or property to the defendants. *Dobrayel,* 287 B.R. at 12 *citing* BLACK'S LAW DICTIONARY at 619 (7th ed.1999). The defendants made false or misleading statements regarding (1) their exclusive agreement for the Y2K Program, (2) the existence of customers, and (3) the intention to use the investment for capital for Millennium. The evidence at trial reflected that when the defendants made these statements, the defendants had run low on funds and had little or no available credit.

■ One court has recognized the challenge in presenting evidence which bears directly on the element of intent to deceive, as one will rarely admit to such intent. *In re Senty,* 42 B.R. 456, 459 (Bankr.S.D.N.Y.1984). However, it is well established that intent to deceive may be established through circumstantial evidence and inferred from the totality of the evidence presented. *In re Shaheen,* 111 B.R. 48, 53 (S.D.N.Y.1990)( "intent to deceive may be inferred when the totality of the circumstances presents a picture of deceptive conduct by the debtor, which indicates that he did intend to deceive and cheat the [creditor]"); *In re Kimzey,* 761 F.2d 421, 424 (7th Cir.1985)(an intent to deceive can be logically inferred from a defendant's false representations which the debtor must know will induce another to give over money). Here, the plaintiffs have met their burden of demonstrating an intent to deceive on the part of the defendants. *Senty,* 42 B.R. at 459. The defendants' actions from the beginning of negotiations with Voyatzoglou through the failure to provide financial information as the Heads of Agreement required constituted a pattern of knowing and deceptive conduct. The Court finds from the totality of the circumstances presented that the defendants intended to deceive the plaintiffs by making false statements. The

debt is nondischargeable as a debt for money or property obtained by a false representation Code Section 523(a)(2)(A).

C. The Defendants Obtained Monies Through Actual Fraud. The Claim Is Nondischargeable Under Code Section 523(a)(2)(A)

■ To prove the nondischargeability of a debt for money or property obtained under actual fraud under Code Section 523(a)(2)(A), the plaintiffs must establish six elements by a preponderance of the evidence. *In re Boice,* 149 B.R. 40, 43–44 (Bankr.S.D.N.Y.1992); *see also Dobrayel,* 287 B.R. at 12; *In re Shaheen,* 111 B.R. 48, 51 (S.D.N.Y.1990). First, the plaintiff must show that the defendants obtained money or property. Plaintiffs have easily satisfied this element, as it is undisputed that the defendants obtained monies in the amount of $175,000 from Voyatzoglou. Compl., ¶ 10, Answer, ¶ 4. Second, the plaintiffs must establish that the defendants obtained the money or property through a knowing and false representation, false pretenses, or actual fraud. The evidence at trial established the defendants obtained the money through knowing false representations, false pretenses and actual fraud. The defendants knowingly misrepresented that they had the exclusive right in Thailand to ConSyGen's Y2K Program. They falsely stated that Millennium had signed customers for the Y2K Program. The defendants each drew a salary and paid personal expenses without an employment contract in violation of the Heads of Agreement. The defendants falsely told Voyatzoglou that they would transfer his investment into the Millennium Account to pay business expenses, and instead used a portion of the money to pay personal expenses. Finally, the defendants failed to return the money to Voyatzoglou when they failed to enter into a

final contract, in violation of the Heads of Agreement.

■ Third, the plaintiffs must show that they have relied upon the defendants' representation(s) and that this reliance was reasonable. Reasonableness is a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith. *Shaheen*, 111 B.R. at 53. Reasonableness must be determined by evaluating all the facts and circumstances. *Id.* " '[R]easonableness' requires that representations must be found to be of such a character that a reasonably prudent person would rely on them. Such a standard fosters a responsible and careful use of solicited financial statements and discourages the 'spurious use' of such statements." *Iverson* at 225. Here, Voyatzoglou reasonably relied on the debtors' misrepresentations. The defendants failed to provide financial records which would have revealed their expenditures, their established customers, and the lack of an exclusivity agreement. The defendants also induced plaintiffs to make the initial advance quickly, to permit the defendants to move to a new office.

■ Fourth, the plaintiffs must establish that the defendants knew or should have known that the representations were false when made. The evidence presented established that the defendants knew that they did not have the exclusive right to distribute the Y2K Program and that when they solicited the plaintiffs' investment, Millennium had no signed customers for the Y2K Program. The defendants falsely told Voyatzoglou that they would transfer his investment into the Millennium Account to pay business expenses, and in-stead used a portion of the money to pay personal expenses.

■ Fifth, the plaintiffs must establish that the debtors made the representation(s) with the intent to deceive. Examining the totality of the circumstances, the plaintiffs have met their burden of demonstrating an intent to deceive on the part of the defendants. *Senty*, 42 B.R. at 459. The defendants caused the plaintiffs to believe Millennium needed an immediate infusion of cash for its business, yet used the funds in large part for personal expenses, drawing salaries and unilaterally signing employment agreements when they knew that the Heads of Agreement did not contemplate such actions until entry into a final contract. The defendants knowingly misrepresented the existence of customers and the nature of their deal with ConSyGen. From the totality of these deceptive acts, the Court finds that the defendants intended to deceive the plaintiffs.

Sixth, the plaintiffs must establish that they have been injured by the representation. *In re Boice*, 149 B.R. at 44–45. The evidence established that the plaintiffs advanced $175,000.00, and Smith acknowledged those funds were not returned.

IV. The Claim Is Based On A Debt For Monies Obtained by a Materially False Written Statement Respecting the defendants' Financial Condition and Is Excepted from Discharge under Code Section 523(a)(2)(B).

■ The plaintiffs also sought a determination of nondischargeability under section 523(a)(2)(B).[11] The plaintiffs must

---

11. Section 523(a)(2)(B) excepts from discharge a debt for:

money ..., to the extent obtained by use of a statement in writing (1) that is materially false; (2) respecting the debtor's ... financial condition; (3) on which the creditor to whom the debtor is liable for such money ... reasonably relied; and that (4) the debt-

prove five elements to establish the non-dischargeability of its Claim against defendants under Code Section 523(a)(2)(B). The first element is the use of a statement in writing by the defendant. Oral statements relating to a debtor's financial condition thereby remain dischargeable. *In re Bogdanovich,* 292 F.3d 104, 111 (2d Cir.2002). The plaintiffs need not prove that the defendants completed the writing constituting the false statement in its entirety. *Id.* It is sufficient that the defendants either wrote, signed, or adopted such statement to find that the documents were "written" by them. In this case, the writings include the Solicitation Letter, numerous e-mails, and the Heads of Agreement.

The second element which the plaintiffs must establish is that the writing the defendants used was materially false. For a financial statement to qualify as being "materially false," it must be "one which paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Boice,* 149 B.R. at 45. The information must not only be substantially inaccurate, but it must also be information which would have affected the creditor's decision making process. *Id.* The misrepresentation of ownership of assets and the failure to divulge the true ownership interests in the listed property is "material falsity" for purposes of Section 523(a)(2)(B). *Boice,* 149 B.R. at 45–46; *See Scarsdale Nat'l Bank & Trustee Co. v. Switzer (In re Switzer),* 55 B.R. 991, 995 (Bankr.S.D.N.Y.1986). The e-mails and Solicitation Letter made false representations regarding the existence of a customer base and the exclusive use of the Y2K Program. These were material misrepresentations.

The third element which the plaintiffs must establish is that the materially false writing concerns the defendants' or an insider's financial condition. In determining whether a statement relates to a debtor's financial condition, courts agree the term is not limited to formal financial statements. *Bogdanovich* at 112. A statement concerning the ownership of assets clearly qualifies as a statement regarding financial condition. *Engler v. Van Steinburg (In re Van Steinburg),* 744 F.2d 1060, 1060–61 (4th Cir.1984)(holding that a debtor's assertion that he owned property free and clear of liens is a statement respecting his financial condition). The false statements relate to the financial condition of Millennium as the Y2K program and the customers would have given it value. The false statement that the investment would be passed into Millennium's Accounts also is a statement regarding financial condition.

The fourth element which plaintiffs must establish is that the plaintiffs reasonably relied on the materially false written statement. The test as to "reasonable reliance" focuses on whether the statement is of such a nature that a reasonably prudent person would rely upon it. *Boice* at 46. Examples of unreasonable reliance on a materially false financial statement include situations where the creditor knows or has reason to know that the financial statement is false; where the financial statement is so deficient that it fails to portray a realistic picture of the debtor's financial status; where the creditor's own investigation indicates that the financial statement may be false; or where the creditor, under certain circumstances, failed to verify the information contained in the statement. *Id.* at 47.

or caused to be made or published with intent to deceive.

The evidence at trial amply established that the plaintiffs' reliance upon the defendants' written statements was reasonable. A mutual friend introduced the plaintiffs to the defendants. The defendant Smith was an attorney and the defendants had an attorney in Thailand. These factors reasonably could have caused Voyatzoglou to rely on the defendants' written statements. But Voyatzoglou took additional steps to protect himself and his investment. Voyatzoglou met with representatives of ConSyGen regarding the product and how it worked. Voyatzoglou met in Thailand with the defendants and with employees of Millennium. Voyatzoglou drafted the Heads of Agreement, which required the return of his investment if the parties did not enter into a final contract. He did not make the final payment after defendants failed to provide written financial information. The Court finds that under these circumstances, the plaintiffs' reliance upon the defendants' written statements was reasonable.

■ The fifth element which the plaintiffs must establish is that the defendants caused the statement to be made or published with an intent to deceive. Examining the totality of the circumstances, the plaintiffs have met their burden of demonstrating an intent to deceive on the part of the defendants. *Senty,* 42 B.R. at 459. The defendants misrepresentations in the written statements—false claims regarding signed contract providing a customer base and regarding the exclusivity of their relationship with ConSyGen—were, by their very nature, evidence of an intent to deceive. The defendants caused the plaintiffs to believe Millennium needed an immediate infusion of cash for its business, yet used the funds in large part for personal expenses, drawing salaries and unilaterally signing employment agreements when they knew that the Heads of Agreement did not contemplate such actions until a formal contract had been finalized. The Court finds the debt is nondischargeable under Section (a)(2)(B) of the Bankruptcy Code.

V. The Defendants Embezzled the Money and Property of the Plaintiffs. The Claim is Excepted from Discharge under Section 523(a)(4).

■ In the Fourth Claim For Relief, the plaintiffs allege that the claim consists of claims against the defendants for money and property obtained by fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, and should be excepted from discharge pursuant to section 523(a)(4) of the Bankruptcy Code. Compl., ¶¶ 39–40. A plaintiff attempting to except a debt from discharge under this section must prove each element by a preponderance of the evidence. *In re Bonnanzio,* 91 F.3d 296, 300 (2d Cir.1996).

■ With respect to the allegations of fraud or defalcation while acting in a fiduciary capacity, an essential element which the plaintiffs must establish is whether the relationship between the defendants and the plaintiffs constituted a fiduciary relationship. *Id.* In determining this issue, this Court must look to both state and federal law. *In re Moskowitz,* 310 B.R. 21 (Bankr.E.D.N.Y.2004). The scope of the concept of a fiduciary is a question of federal law; state law determines whether a trust obligation exists. *Id.* at 30 (citations omitted). Several factors come into play in determining whether a trust relationship exists. First, the trust relationship must exist prior to the act creating the debt. Second, the act creating the debt must have been done during the course of the relationship. Third, the debt must be based on an express, technical or statutory trust. *Id.* Courts have found a trust relationship

does not exist where the basis for the assertion of a trust is a contractual relationship only. *Id.* at 30–31.

Here, no trust relationship existed between the plaintiffs and the defendants before the creation of the debt. No trust relationship pursuant to statutory or common law has been alleged. The only relationship that existed was a contractual relationship based on the Heads of Agreement. The plaintiffs and the defendants did not enter into a final contract. Therefore, there was no fiduciary relationship, and the debt cannot be found nondischargeable on that basis under that Code Section 523(a)(4).

Section 523(a)(4) also excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the "appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement." 4 L. King, COLLIER ON BANKRUPTCY ¶ 523.10[2] at 523–77 (15th Ed. rev.1998). Whether the actions of the defendants in this case constituted a larceny or an embezzlement within the meaning of Section 523(a)(4) is a matter of federal law. *Great American Insurance Co. v. Graziano,* 35 B.R. 589 (Bankr.E.D.N.Y.1983).

There are five elements plaintiffs must establish by a preponderance of the evidence to establish the defendants committed a larceny: (1) the wrongful taking (2) of property (3) of another (4) without the owner's consent (5) with intent to convert the property. *Graziano,* 35 B.R. at 594; COLLIER ON BANKRUPTCY, supra ¶ 523.10[2] at 523–76. The Court finds that the actions of the defendants did not constitute a larceny, because the original taking of the money by the defendants was not unlawful. *Graziano,* 35 B.R. at 593–94.

There are also five elements plaintiffs must establish by a preponderance of the evidence to establish the defendants committed an embezzlement: (1) the entrustment to the debtor of (2) property (3) of another (4) which the debtor appropriates for his or her own use (5) with intent to defraud. *In re Bevilacqua,* 53 B.R. 331, 333–34 (Bankr.S.D.N.Y.1985). A debtor need not have been a fiduciary to commit embezzlement under Section 523(a)(4). *In re Bevilacqua,* 53 B.R. at 334; *Moreno v. Schwartz (In re Schwartz),* 36 B.R. 355, 358 (Bankr.E.D.N.Y.1984).

The evidence presented at trial established that the actions of the defendants in this case constituted an embezzlement. The original taking of the property was lawful, as the monies came into the defendants' personal accounts with the consent of the owner. COLLIER ON BANKRUPTCY, supra ¶ 523.10[2] at 523–76 (citing Black's Law Dictionary 522 (6th Ed.1990)). Voyatzoglou entrusted the property to the defendants with the expectation it would be used for Millennium. The Court finds the totality of the circumstances demonstrate that the defendants had an intent to defraud Voyatzoglou of his property. Their misrepresentations caused him to invest in Millennium. The defendants used this investment in part to pay themselves salaries and pay personal expenses in violation of the Heads of Agreement. They failed to provide financial information which caused the breakdown of negotiations. The defendants engaged in embezzlement and the debt is excepted from discharge under 523(a)(4).

VI. The Claim Constitutes a Debt for Willful and Malicious Injury and Is Excepted From Discharge Under Code Section 523(a)(6).

In the Fifth Claim For Relief, the plaintiffs allege that the claim consists

of debt for willful and malicious injury by the defendants to the plaintiffs or their property, and the claim should be excepted from discharge pursuant to Section 523(a)(6) of the Bankruptcy Code. The first element of the cause of action is that the injury must be willful on the part of the defendants. The word willful modifies the word injury, "indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The Court has found the defendants deliberately and knowingly took the funds.

▮▮▮▮▮▮ The second element which the plaintiffs must establish is that the defendants caused the injury maliciously. This element can be satisfied by either actual or constructive malice. *Navistar Financial Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84 (2d Cir.1996). A malicious injury is a wrongful injury, caused without just cause or excuse but does not require "personal hatred, spite, or ill-will." *In re Scheller*, 265 B.R. 39, 54–55 (Bankr.S.D.N.Y.2001). Maliciousness will be found where the "debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance to warrant the denial of discharge." *In re Blankfort*, 217 B.R. 138, 144 (Bankr.S.D.N.Y.1998). Malice "is implied when anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *United Orient Bank v. Green*, 215 B.R. 916, 928 (S.D.N.Y. 1997). The defendants had a contractual duty under the Heads of Agreement to return the funds when they failed to enter into a final contract. The defendants' failure to return the money has injured the plaintiffs. The Court finds the defendants caused a willful and malicious injury and the debt is excepted from discharge under Section 523(a)(6).

VII. The Entire Claim Is Nondischargeable Including Treble Damages for Fraud, Attorneys' Fees and Costs.

▮▮▮▮▮▮ Having determined that the debt is nondischargeable under Bankruptcy Code Sections 523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6), the Court must determine whether the entire amount of the claim is nondischargeable, including the claim for treble damages, attorneys' fees and costs. The plaintiffs brought the State Court Action in Florida. Under Florida law, proof of embezzlement by clear and convincing evidence gives rise to a claim for treble damages, costs and attorneys fees. *In re Britt*, 200 B.R. 409, 411 (Bankr.M.D.Fla.1996); Fla. Stat. Ann. § 772.11 (West 2005).[12] The plaintiffs have demonstrated the embezzlement, fraud, and false pretenses by clear and convincing evidence, and is entitled to compensatory damages, treble damages, costs and attorneys fees under Florida law. The Supreme Court has determined that "[w]hen construed in the context of the

12. Fla. Stat. § 772.11 provides: Any person who proves by clear and convincing evidence that he has been injured in any fashion by reason of any violation of the provisions of ss. 812.012–812.037 has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorneys' fees and Court costs in the trial and appellate courts.

Sections 812.012–812.037 include embezzlement, fraud, false pretenses, embezzlement, and other theft related actions.

statute as a whole, then, § 523(a)(2)(A) is best read to prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc., including an award of treble damages for the fraud." *Cohen v. de la Cruz*, 523 U.S. 213, 220, 118 S.Ct. 1212, 1217, 140 L.Ed.2d 341 (1998). "The meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge ...." indicate that all debt arising from that fraud is nondischargeable. *Id.* at 221, 118 S.Ct. 1212. Thus, any debt for "money, property, services, or ... credit, to the extent obtained by fraud encompasses any liability arising from money ... fraudulently obtained, including treble damages, attorneys' fees, and other relief that may exceed the value obtained by the debtor" is nondischargeable. *Id.* at 223, 118 S.Ct. 1212. Courts have interpreted this holding to apply to nondischargeable claims under Sections 523(a)(4) and 523(a)(6) as well. *See, e.g., In re Scheller,* 265 B.R. 39, 55 (Bankr.S.D.N.Y.2001). The entire claim amount in this case is based on the defendants' embezzlement and fraudulent actions. Therefore, the entire claim is nondischargeable.

### CONCLUSION

The defendants are not collaterally estopped from contesting the allegations. The plaintiffs' claim is valid in the full claim amount. The claim consists of debts for money obtained by the defendants from the plaintiffs through false pretenses, false representations, or actual fraud, and is excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2)(A). The claim consists of debts for money obtained through the defendants use of materially false written statements made with the intent to deceive the plaintiffs and on which the plaintiffs reasonably relied and is nondischargeable pursuant to Bankrupt-

cy Code Section 523(a)(2)(B). The claim consists of debts arising from the defendants' embezzlement of plaintiffs' money and is nondischargeable pursuant to Bankruptcy Code Section 523(a)(4). Finally, the claim consists of debts arising from the defendants' willful and malicious injury of the plaintiffs and thus is nondischargeable pursuant to Bankruptcy Code Section 523(a)(6).

IT IS SO ORDERED.